**Don R. HILTON, Plaintiff–Appellant Cross–Appellee,**

v.

**SOUTHWESTERN BELL TELEPHONE COMPANY, Defendant–Appellee Cross–Appellant.**

No. 90–7006
Summary Calendar.

United States Court of Appeals, Fifth Circuit.

July 30, 1991.

Kenneth H. Molberg, Wilson, Williams & Molberg, Dallas, Tex., for plaintiff-appellant cross-appellee.

William A. Brown, Southwestern Bell Telephone Co., Dallas, Tex., for defendant-appellee cross-appellant.

Before SMITH, DUHÉ and WIENER, Circuit Judges.

PER CURIAM:

In this Texas diversity case Plaintiff–Appellant Don R. Hilton's suit against his employer, Defendant–Appellee, Southwestern Bell Telephone Company, a Missouri

corporation, claiming employment discrimination against a "handicapped person" under the Texas Commission on Human Rights Act, Tex.Rev.Civ.Stat.Ann. art. 5221k (Vernon, 1987)[1] (hereafter TCHRA), was dismissed by the district court when it granted Southwestern's motion for summary judgment. The court held "as a matter of law" that AIDS and its related illnesses "by themselves" are not "handicaps" as defined in TCHRA. The district court also dismissed as moot Hilton's pending motion for a preliminary injunction. Concluding that the district court committed no reversible error, we affirm and, in so doing, find it unnecessary to consider the issues raised by Southwestern on cross appeal.[2]

## I.

Hilton sued Southwestern in state district court claiming that Southwestern had refused to allow him to return to work, had ultimately fired him, and had otherwise discriminated against him, on the basis of a "handicap" (AIDS or AIDS–Related Complex (ARC)), in violation of TCHRA. After Southwestern removed the case to federal district court on diversity of citizenship, Hilton moved for a preliminary injunction. Following an evidentiary hearing on the injunction at which considerable evidence was adduced—including evidence of the diagnoses and opinions of four physicians— and after the filing of briefs, but before a decision was rendered on the injunction, Southwestern filed its motion for summary judgment to which plaintiff responded. The district court granted Southwestern's motion for summary judgment based on that court's determination that Hilton was not "handicapped" for purposes of the TCHRA. Hilton's suit was dismissed, and his motion for injunctive relief was denied as moot. Hilton timely filed his notice of appeal to this court.

## II.

The historical facts of this case exemplify an often replicated modern tragedy, evoking the sympathy of this court and, we speculate, that of the district court and of Hilton's employer, thereby making more difficult the decisions at each such level. Stripped of its pathos, however, this case hinges on the distinction between the meanings of *handicapped* under TCHRA and *disability*.

Southwestern hired Hilton in December, 1976. He worked in the field until a knee injury unrelated to AIDS terminated his ability to climb telephone poles, after which his employment was changed to drafting clerk in the Engineering Design section of Southwestern's Network Distribution Services Department. Late in October, 1986, Hilton's physician, Terry Pulse, M.D., diagnosed Hilton as having "HIV+/ARC with thrombocytopenia/ITP." ITP is a low blood platelet count condition described by Dr. Pulse as "life threatening!" at a time when Hilton had a platelet count of $14{,}000/mm^3$, the normal platelet count range being from 140,000 to $250{,}000)/mm^3$.

Southwestern is a subsidiary of Southwestern Bell Corporation. Southwestern's employees participate in several of Southwestern Bell Corporation's non-contributory benefit plans. One is the Southwestern Bell Corporation Sickness and Accident Disability Benefit Plan (the Temporary Plan), providing up to fifty-two weeks of sickness disability benefits for employees with at least six months of service who are totally disabled from available telephone company work. Non-management employees, such as Hilton, who exhaust sickness disability benefits under the Temporary Plan, may apply for benefits under another Southwestern Bell Corporation Plan (the Long Term Plan). Both the Temporary Plan and the Long Term Plan provide wage replacement benefits. Separate plans pro-

1. All the alleged unlawful employment practices made the subject of plaintiff's pleadings took place in 1987, so references to the Act are to that statute prior to September, 1989, the effective date of 1989 amendments.

2. Southwestern asserted time bar, absence of evidence of pretext, action taken pursuant to a bona fide employee benefit plan which is not a subterfuge, and federal preemption because Hilton was covered by a collective bargaining agreement.

vide medical expense reimbursement for both active and retired employees. For purposes of medical coverage, a former employee receiving benefits under the Long Term Plan is treated the same as is a retired employee. All of Southwestern's employees who exhaust their benefits under the Temporary Plan and who apply for and are approved for benefits under the Long Term Plan are effectively terminated from employment by being removed from the active payroll. If such an employee should recover, he may apply for re-employment, but re-employment is not guaranteed.

On or about October 31, 1986, Hilton was absent from work claiming total disability due to a medical condition. On November 7, 1986, he began receiving sickness disability benefits under the Temporary Plan. From November 3, 1986, through September 23, 1987, Dr. Pulse submitted at least twelve separate documents substantiating Hilton's total disability from work.

At the direction of Southwestern's supervisory personnel, Brady L. Allen, M.D., an internist and an independent medical consultant, examined Hilton on August 18, 1987. In his August 20, 1987, report Dr. Allen found Hilton to be "totally disabled at this point secondary to rather severe ARC."

On October 1, 1987, approximately eleven months following commencement of Hilton's disability benefit period, Hilton advised his supervisor that Dr. Pulse had released him to return to work and that he (Hilton) intended to return. His supervisors immediately advised him that he should not return to work until further notification and that another medical examination and consultation were being scheduled. On the following day another independent medical consultant, James R. Farris, M.D., examined Hilton and found him to have a blood platelet count of $6,000/mm^3$. Dr. Farris advised that, due to the "severity of this patient's thrombocytopenia," Hilton should not be returned to work and that even sedentary job duties were "implausible."

The issue was then considered by James T. Wheeler, M.D., Southwestern's Medical Advisor and a specialist whom Hilton's physician, Dr. Pulse, identified as an expert Pulse would consult in an ITP situation. Based on the Farris examination and report, on previous medical examinations and laboratory test results, and on other information available to Southwestern's Benefit Office concerning Hilton's disability status, Dr. Wheeler advised Southwestern that Hilton was totally disabled from even his sedentary drafting position.

On October 16, 1987, supervisors in Hilton's department considered and accepted Dr. Wheeler's conclusions and decided to advise Hilton that he would not be allowed to return to work. Hilton was so advised that day and was told that upon acceptance of long term disability benefits he would be removed from the payroll.

Hilton responded to supervisors that, in his opinion, Southwestern was discriminating against him and that he intended to file legal charges against Southwestern. Hilton's attorney contacted Dr. Wheeler to discuss the basis of Southwestern's decision. A short time later, however, Hilton applied for and was granted disability status under the Long Term Plan, and was removed from Southwestern's active payroll.

Both Hilton and Southwestern agree—in fact insist—that Hilton was not allowed to return to work because Southwestern determined that Hilton would be subjected to an unacceptable risk of harm. The parties also agree that Hilton exhausted his 52–week period of temporary disability, at the end of which he either had to go on permanent disability or return to work, but that Southwestern had denied him the latter alternative. And the parties agree that (1) Hilton's return to his job would pose no real risk to those around him; (2) the risk posed by ITP was to Hilton and Hilton alone; and (3) Hilton's termination was the direct result of his low platelet count associated with his ITP. Hilton does not contend that Southwestern's placing him on permanent disability due to his ITP was a pretext, agreeing that the real reason was

his ITP resulting from AIDS or ARC. In fact, Hilton purports to support his case by quoting Dr. Wheeler's statement that Hilton's low platelet count was the "exclusive" reason for Southwestern's action, and that, as a matter of course, Southwestern disqualifies all individuals suffering from low platelet counts.[3]

Hilton also cites in support of his claim the acknowledgment by Southwestern's Dr. Wheeler that Hilton's medical condition is one which is generally perceived as severely limiting one's work-related functions, adding that both Hilton's and Southwestern's evidence supports such a view as well as the opinion that Hilton's condition is terminal and dangerous.

### III.

■ This court reviews the grant of summary judgment motion de novo, using the same criteria used by the district court in the first instance. *Walker v. Sears, Roebuck & Co.*, 853 F.2d 355, 358 (5th Cir.1988). We "review the evidence and inferences to be drawn therefrom in the light most favorable to the non-moving party." *Baton Rouge Bldg. & Constr. Trades Council v. Jacobs Constructors, Inc.*, 804 F.2d 879, 881 (5th Cir.1986) (per curiam) (citing *Southmark Properties v. Charles House Corp.*, 742 F.2d 862, 873 (5th Cir. 1984)). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R. Civ.P. 56(c). A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "Material facts" are "facts that might affect the outcome of the suit under the governing law." *Id.*

If, in our de novo review, we find on the basis of the extensive summary judgment evidence presented in this case that there is no genuine issue of material historical fact or expert opinion, but only a difference of opinion between Hilton and Southwestern as to the conclusion to be drawn from those uncontested historical facts and expert opinions, the question whether the inference to be drawn therefrom is legal or factual becomes a non-issue. We find, for the reasons set forth below, that in October, 1987, Hilton was "disabled" for purposes of both the Temporary Plan and the Long Term Plan but was not "handicapped" for purposes of TCHRA. And, albeit a non-issue, we confirm on the basis of the Texas Supreme Court's pronouncement in *Chevron Corp. v. Redmon*, 745 S.W.2d 314, 318 (Tex.1987), that determination of whether Hilton was handicapped for purposes of TCHRA is a question of law under the circumstances of this case.

### IV.

*A. Statutory Definitions.*

■ We begin with the plain wording of the applicable portions of TCHRA. Section 2.01(7)(A) states:

"Handicapped person" means a person who has a mental or physical handicap, including mental retardation, hardness of hearing, deafness, speech impairment, visual handicap, being crippled, or any other health impairment that requires special ambulatory devices or services, as defined in Section 121.002(4) of Human Resources Code...."

Tex.Rev.Civ.Stat.Ann. art. 5221k, § 2.01(7)(A). We find no additional clarification in that section's reference to the Human Resources Code because, in § 121.002(4) of the HRC, the definition of a "handicapped person" is, verbatim, the same as in TCHRA. Likewise, Section 2.01(7)(B) of TCHRA defines "handicap" in essentially identical terms as those used in its preceding subsection to define "handicapped person," and likewise refers to the

---

3. The record reveals that, at the time of the injunction hearing on August 4, 1989, Southwestern had 18 employees in the Dallas division who had been diagnosed as having AIDS, and that 11 of those 18 were still working.

definition in the Human Resources Code, to-wit:

> "Handicap" means a condition either mental or physical that includes mental retardation, hardness of hearing, deafness, speech impairment, visual handicap, being crippled, or any other health impairment that requires special ambulatory devices or services, as defined in Section 121.002(4), Human Resources Code....

Tex.Rev.Stat.Ann. art. 5221k, § 2.01(7)(B).

In looking to the two definitional subsections in TCHRA to determine whether, in fact or in law, Hilton's ITP was a "handicap" and whether Hilton was a "handicapped person," we first encounter § 2.01(7)(A) which defines a handicapped person as "a person who has a mental or physical handicap." Needing a definition of "handicap," we must move immediately to § 2.01(7)(B) which purports to define "handicap." There we are told that "handicap" is either a mental or physical condition, but we are not told what characteristics or effects a mental or physical condition must have in order to constitute a handicap. The only clue we are given is a non-exclusive list of some of the particular mental or physical conditions that TCHRA deems to be handicaps.

■ For definitional statements of that ilk, the only interpretative tool available is the classic *ejusdem generis* rule: When general words follow an enumeration of persons or things, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned. That rule is one of limitation, restricting general terms, such as "any other" and "and the like," which follow specific terms, to matters similar to those specified. *See, e.g., United States v. La Brecque,* 419 F.Supp. 430, 434 (D.N.J.1976).

While TCHRA's definitional subsections' use of "includes" immediately preceding the list of specific handicaps precludes that list from being interpreted as exclusive, the specific handicaps thus listed, followed by the general words, "or any other health impairment that requires special ambulatory or services" is clearly restrictive. Given the types of handicaps listed and the general language that follows the list, "handicapped" cannot mean simply *any* mental or physical condition. In applying the *ejusdem generis* rule we must, therefore, determine what element or elements are common to each of the particular handicaps identified in the illustrative list. Only by finding such a common thread can we gain insight into the breadth or narrowness of the category being defined by example.

■ In the instant case we are not concerned with a question of *mental* handicap, so we disregard the particular condition appearing first in the list, mental retardation. The element common to each of the remaining, *physical* conditions in the statutory list—hardness of hearing, deafness, speech impairment, visual handicap, and being crippled—is that each is a *physiological* rather than *pathological* condition of physical health. Although the original *cause* of each condition could be pathological, congenital, traumatic or the like, in each instance the resulting *condition* is physiological. Thus, a proper application of the *ejusdem generis* rule leads us to conclude that, other than the particular physical conditions identified in the list, the only physical health conditions capable of constituting a "handicap" for purposes of TCHRA are those which may properly be classified as *physiological* impairments. Every individual condition in the non-exclusive list is a physiological health impairment, so any "other" condition must be a physiological impairment if it is to be deemed a handicap under TCHRA. Moreover, a properly strict application of the *ejusdem generis* rule would add to the list of specific handicaps only such "other" physiological health impairments as also "require special ambulatory devices or services." TCHRA § 2.01(7)(A) and (B). *See also* Human Resources Code, § 121.002(4). Ambulatory devices are only needed to mitigate the debilitating effects of physiological impairments.

From the standpoint of statutory construction, then, the summary judgment evi-

dence in this case eschews any possibility that Hilton's AIDS, ARC or ITP come within the ambit of TCHRA's definition of "handicapped." For all of their horrors, those diseases and conditions have produced in Hilton essentially invisible, pathological results, but no physiological impairments. His ITP has not affected his hearing, speech, vision, taste or smell. Neither has his ITP affected his ability to walk, use his hands and arms, sit or stand. The ITP has not physically "crippled" Hilton. We speculate that neither a layman nor a physician who is unknowledgeable about Hilton's disease would suspect a problem merely by looking at him and watching his physical activities on or off the job.

As TCHRA fails to define *handicap* or *handicapped person* in any manner except by analogical extension of the non-exclusive, illustrative list of health impairments of the type that constitute handicaps, our only source of information is that list of examples. Even if we disregard the additional restriction of "special ambulatory devices or services," we still cannot force AIDS or ARC or ITP into the category of health impairments defined by an *ejusdem generis* extension of that non-exclusive list of impairing conditions.

### B. Discrimination Because of Handicap.

■ The substantive provision of TCHRA applicable to the instant case is contained in ARTICLE 5. DISCRIMINATION IN EMPLOYMENT, to-wit:

Sec. 5.01. It is an unlawful practice for an employer:

(1) to ... discharge an individual or otherwise discriminate against an individual with respect to compensation or the terms, conditions or privileges or employment because of ... handicap....

Basically ignoring the definitional provisions of § 2.01(7)(A) and (B), Hilton insists that one of the "[S]pecific rules of construction" found in § 1.04 of TCHRA somehow mandates a determination in his favor under the above quoted discrimination provision of ARTICLE 5. The special rule of construction relied on by Hilton is subsection (b):

(b) In Article 5, "because of handicap" or "on the basis of handicap" refers to discrimination because of or on the basis of a physical or mental condition that does *not* impair an individual's ability to reasonably perform a job. (emphasis added).

Tex.Rev.Civ.Stat.Ann. art. 5221k, § 1.04(b). Agreeing with Southwestern that his medical condition, ITP, is one which is generally perceived as severely limiting one's work-related functions and that it is "beyond dispute" that his condition is "life threatening," Hilton emphasizes in his brief to this court that "[n]evertheless, [Hilton's] illness, which restricts his ability to perform various physical functions,.... *does not* affect his ability to reasonably perform the duties required by the sedentary job of a Drafting Clerk." (emphasis in original).

Accepting, arguendo, Hilton's first thesis that, as per *Redmon*, a claimant's threshold burden in seeking to establish that he is "handicapped" for purposes of TCHRA is to show that his disqualifying condition is one which is "generally perceived as severely limiting him in performing work-related functions in general," *Redmon*, 745 S.W.2d at 318; and accepting, arguendo, his second thesis that his own illness does not prevent the reasonable performance of duties associated with his Drafting Clerk job, we must nevertheless conclude that he is neither "handicapped" as defined in TCHRA, nor, if he were handicapped, discriminated against, under that act. To hold otherwise would be to treat § 1.04(b) as a mandatory, per se rule, requiring an automatic finding of discrimination in every instance of a "handicap" that does *not* impair the employee's ability to perform the specific functions of a job. Even accepting Hilton's first two theses, his logic to reach the conclusion of his syllogism is severely flawed, as is his reliance on *Redmon*. First, the obvious and only purposes of § 1.04(b) of TCHRA is to shield employers from claims of discrimination by an employee whose physical or mental condition is a "handicap" which does in fact impair

his "ability to reasonably perform a job." Simply put, TCHRA does not force employers to hire or retain a handicapped person who, because of his handicap, simply cannot perform a job. But Hilton would have us turn this employer's shield into an employee's per se sword, so that the firing of any employee who has a handicap that does *not* impair his ability "to reasonably perform a job" will automatically be deemed a termination "because of" such handicap and thus per se discriminatory. Such a converse application of § 1.04(b) simply is not warranted. In fact, it was just such an approach by the Texas Court of Appeals that the Texas Supreme Court rejected in *Redmon.*

### C. Other Authorities.

But even if that were the rule—and certainly no Texas court has held it to be—Hilton could not rely on it under the facts of his case. Remembering that our task here is to determine whether Hilton's AIDS or ARC, or his ITP produced by those conditions, is a "handicap" within the meaning of TCHRA, we are forced to reject Hilton's urgings that we be guided by cases which have classified AIDS and AIDS related conditions as handicaps under the Federal Rehabilitation Act. The Texas Supreme Court in *Redmon* forbids such unwarranted analogy. *Redmon,* 745 S.W.2d at 318.

Neither is Hilton's reliance on a 1987 opinion of the Texas Attorney General (Tex.Atty.Gen.Op. No. JM–648 (March 19, 1987)) valid. Most significantly, that opinion predated *Redmon* which obliterated the premises on which the Attorney General's opinion was based. Also, that Attorney General's opinion, issued to the Texas Commission on Human Rights, dealt solely with *standing* and merely concluded, in the negative, that "a number of mental and physical conditions, including chronic illnesses and diseases may be covered under the Act for purposes of a person having a standing to file a complaint" so that, for purposes of standing, "a handicap is not limited to mental and physical conditions expressly enumerated section 2.01(7) of the act and may include chronic illnesses and contagious diseases." *Id.* at 2, 6. Hilton's standing is not

at issue; and Southwestern has nowhere argued that the illustrative definitional lists in § 2.01(7)(A) and (B) are exclusive. We certainly recognize that a physical condition, such as those of a physiological nature identified in the non-exclusive lists in TCHRA, which *results from* a chronic illness or contagious disease may well constitute a "handicap" for purposes of TCHRA. In those instances, however, it is the physiological condition produced by the disease or illness, not the disease or illness itself, that is the handicap.

We concur in the determination of the district court that Hilton's ITP is *not* a handicap for purposes of TCHRA. It clearly produces no mental condition affecting his job performance; neither does it produce an impairing, job-related physiological condition that, under the *ejusdem generis* rule, could be found to fit into the same set of conditions as by analogical extension is defined in the non-exclusive list of examples of the members of that set.

■ Not only does Hilton misconstrue the purpose and use of the special rule of construction of § 1.04(b) of TCHRA, he also reaches an erroneous conclusion that his "physical or mental condition ... does not impair [his] ability to reasonably perform a job." Had Southwestern terminated him for ITP at the time he was a lineman and not reassigned him to the position of drafting clerk, a position which by his own declaration is the most sedentary job in the company, he may well have been able to show discrimination because of handicap within the meaning of TCHRA because § 1.04(b) talks about performing *"a job"* and not *"his* job." But even if we read "a job" to mean "any job," Southwestern met that test because when Hilton advised Southwestern of his AIDS/ARC/ITP, he already held the safest job Southwestern had for sufferers of ITP.

Hilton's problem with § 1.04(b) is with the word "reasonably." Agreeing for the sake of argument that Hilton's ITP does not impair his ability to perform the specific work functions of a drafting clerk, we nevertheless find it inescapable that his

performance cannot be deemed reasonable. Although he poses no threat to others, Hilton's return to work as a drafting clerk would pose to himself a constant risk of instant death. The testimony of his physician, of two independent consulting physicians, and of Southwestern's physician are unanimous in the conclusion that Hilton's alarmingly low platelet count places him in harm's way with his every move. The mere act of traveling from home to work and back each day would be death defying. The slightest jar, whether from a "fender bender," from his own elbow, or from the most innocuous object—the corner of a drafting table, a file cabinet, a water fountain, or a fellow worker's slightest jostle—could rupture his spleen or otherwise cause uncontrollable, fatal bleeding.

TCHRA does not tell employers that, despite such constant exposure to job-related fatality, a condition such as Hilton's does not impair an employee's ability to "reasonably" perform a job. What could be more unreasonable than to tell an employer that, simply because the employee's mental or physical condition does not prevent his drawing lines on tracing paper, using a T-square, or otherwise physically drafting, the employee's physical condition cannot be said to prevent the *reasonable* performance of duties generally associated with or related to the drafting clerk job. Every trip to the pencil sharpener, to the supply closet, to the restroom, to a supervisor's office, or elsewhere—each a job-related function—is for Hilton a potentially fatal act. Working under such Damoclean conditions simply cannot be construed to be a *reasonable* job performance.

### D. The Lessons of Redmon.

As Hilton states in his brief, there are no court decisions construing ITP, or for that matter AIDS or ARC, in the context of TCHRA. Hilton acknowledges that the Texas Attorney General's opinion on standing is the only Texas authority touching on Hilton's disease or contagious diseases generally and, as we have already determined, it is inapposite. *Redmon* is the only significant Texas case to date treating in depth the definition of *handicapped* under

TCHRA. Although Hilton purports to rely on *Redmon*, that reliance is sorely misplaced; *Redmon* actually supports Southwestern's position.

Admittedly, *Redmon* is somewhat distinguishable from this case on its facts—Ms. Redmon's condition was sight impairment which, unlike Hilton's ITP, is not only a physiological impairment in the nature of those contained on the definitional lists but, as a "visual handicap," is one of the illustrative examples expressly listed in § 2.01(7)(A) and (B). Ms. Redmon's visual impairment was moderate while Hilton's disability is extreme. *Redmon* is nevertheless instructive. The Texas Supreme Court found, as we noted above, that TCHRA's definitions of " 'handicap' and 'handicapped person' do not detail what is covered by that term...." So, said that court, "[w]e have therefore examined the entire Act, the predecessor acts, and the legislative history of these acts to determine what the Act is intended to cover." *Redmon*, 745 S.W.2d at 316 (citations omitted). Through its exhaustive examination the Texas Supreme Court found, inter alia, that

A review of the statutes and the legislative history of this Act reveals that the legislature was concerned with protecting persons with impairments of an incapacitating nature. Furthermore, the legislature obviously chose not to employ the definition of "handicap" in the federal Rehabilitation Act, 29 U.S.C. § 701–796(i). In fact, the legislature did not even refer to that Act in section 1.02 describing the purposes of the Act. We therefore choose not to employ the definition of "individual with handicaps" in 29 U.S.C. § 706(8).

*Id.* at 317–18.

In light of such strong rejection, the lengthy discussion of cases under the federal Act in Hilton's brief is unavailing and disingenuous, as is his citation to the Texas Attorney General's opinion without acknowledging that it was emasculated by the Texas Supreme Court in *Redmon*. Equally disingenuous is Hilton's argument that *Redmon* stands for the proposition that determination of a handicapped condi-

tion is a question of fact not, as found by the district court, a question of law. In his brief to this court, Hilton quotes *Redmon*'s statement that "[t]he question of whether a person is 'handicapped' is generally a question of fact for the fact finder." But deliberately omitted from his brief are the two sentences in the *Redmon* opinion which immediately follow the one he quoted. Those sentences read:

> "We hold that based on this summary judgment record, however, there is no evidence that Redmon is handicapped and thus, no fact issue has been raised. *As a matter of law*, Redmon's disabilities do not constitute those severe impairments which article 5221k was intended to protect." (emphasis added).

*Redmon,* 745 S.W.2d at 318.

As was the case with Ms. Redmon whose left eye vision could only be corrected to 20–60 and was thus not deemed by the court to be the type of person "with impairments of an incapacitating nature," *id.*, Hilton's disabilities do not constitute those severe impairments which TCHRA was intended to protect. *Id.* His disease does not produce physiological impairments which prevent him from going to and from work, moving within the building, sitting, standing, obtaining supplies, going to restrooms, lunchrooms, supervisor's offices, or the like. By his own insistence, Hilton's ITP has not *impaired* his ability to perform the professional acts of a drafting clerk. The distinction is that, in performing all of those work-related functions without any limitation, much less severe limitations, he is nevertheless a classical "accident looking for a place to happen."

In a nutshell, Hilton is *totally disabled* but he is neither "severely impaired" as required by *Redmon* nor "handicapped" within the restrictive definition of TCHRA.

To hold otherwise would transform every characteristic an employer uses to make employment decisions into a "handicap." Employers should have the right and the freedom to make their employment decisions without interference unless they discriminate against some protected group which might otherwise be unfairly denied employment.

*Redmon,* 745 S.W.2d at 318.

## V.

The summary judgment evidence establishes without factual disagreement that Southwestern treats all employees with ITP as *disabled* just as it did Hilton. Both the Temporary Plan and the Long Term Plan provide *disability* income for all employees thus disabled; and Hilton was no exception. Other non-contributory plans sponsored by Southwestern's parent corporation provide medical expenses reimbursement to such disabled employees. If in the future Hilton's ITP should diminish to such a degree that his platelet count rises to a safe level, he will be free to apply for reinstatement of employment. All of those benefits that Southwestern provides for its employees hardly paint a picture of a discriminatory employer.

Leaning heavily on professional opinions—those of its own Medical Advisor, two independent consulting physicians, and Hilton's own physician—Southwestern made a totally defensible determination that Hilton is disabled and thus entitled to all disability benefits provided by his employer—a determination which Hilton neither alleged nor presented evidence to prove to be pretextural. If anything in this case has the appearance of pretext it is the insistence by Hilton and Dr. Pulse that in October, 1987, when Hilton's platelet count had dropped to $6,000/mm^3$, he was no longer disabled and was fit for work. After all, it was Hilton and Dr. Pulse who, in October, 1986, and throughout the ensuing eleven months, had maintained continuously that Hilton was totally disabled from working as a drafting clerk because his platelet count was $14,000/mm^3$! One can only ask rhetorically how a worker can be totally disabled for the fifty-two weeks of the Temporary Plan due to a low platelet count but be fit for work when the benefit period runs out despite a platelet count of less than half the count that was so "life threatening" as to produce total disability only a year earlier.

For the foregoing reasons we concur in the district court's grant of summary judgment in favor of Southwestern, dismissing Hilton's lawsuit with prejudice. We also concur in that court's denial of injunctive relief to Hilton as moot. Our agreement with the district court also makes consideration of the issues raised in Southwestern's cross appeal unnecessary. The judgment and related rulings of the district court are

AFFIRMED.