**CENTRAL POWER & LIGHT COMPANY, Appellant,**

v.

**Don BRADBURY, Appellee.**

No. 13–92–426–CV.

Court of Appeals of Texas, Corpus Christi.

Feb. 10, 1994.

Rehearing Overruled March 24, 1994.

---

**3.** Perhaps the court-appointed psychiatrist's evaluation would be of some assistance.

Craig Zobel, J.A. Canales, Canales & Simonson, Corpus Christi, for appellant.

William J. Kolb, Corpus Christi, for appellee.

Before SEERDEN, C.J., and YAÑEZ and DORSEY, JJ.

## OPINION

YAÑEZ, Justice.

Mr. Bradbury sued his employer, Central Power & Light (CP & L), for discriminating against him and eventually terminating him due to a handicap. *See* TEX.REV.CIV.STAT. ANN. art. 5221k *et seq.* (Vernon 1987). After a bench trial, the court entered judgment against CP & L for back pay and attorney's fees and ordered CP & L to reinstate Mr. Bradbury to the position of auxiliary operator. By nine points of error, CP & L complains of legally and factually insufficient evidence to support the judgment, of error in pretrial rulings on discovery, and of the denial of a jury trial. Based upon the legal insufficiency of the evidence, we reverse and render, addressing only those points germane to our holding.

Mr. Bradbury has a skin condition known as chronic atopic dermatitis, or eczema, which causes his skin to itch intensely, split, crack, and peel. Because his condition is exacerbated by cool, dry air, Bradbury moved to South Texas where the climate is more agreeable to his skin. He began working for CP & L in 1977 as a plant repairman at the Bates Power Plant in Mission, Texas. He was promoted to auxiliary operator and received favorable evaluations from his superiors in that position. An auxiliary operator's duties include taking instrument readings and monitoring equipment, these tasks being done primarily outside. As an auxiliary operator, Bradbury eventually began training to promote to the position immediately above auxiliary operator—"C" level operator.

"C" operators work in an air conditioned control room which is cooled by "reheat" air conditioning, a method that removes moisture from the air. Bradbury soon found that working full time in the control room exacerbated his condition immensely. After a week, the condition had spread over most of his body, and Bradbury's skin was scaly, cracked, and very painful. Two weeks after moving into the control room, Bradbury's skin condition became so inflamed that he had to peel off the dry, cracked layers of skin after each shift. This debridement process was extremely painful. Bradbury consulted his dermatologist who prescribed Prednisone and cortisone, but after three weeks, Brad-

bury knew that working in the control room was too much for him. He informed Jimmy LaForge, his supervisor, of the problem. LaForge merely told him he needed to work harder. Shortly thereafter, Bradbury had a meeting with Bobby Glenn, the Bates Power Plant manager, and Bobby Brewer, the assistant manager. Brewer suggested withholding part of a promised raise from Bradbury because he was not trying to progress. Although his immediate supervisors twice recommended Bradbury for raises that would have put him at top pay levels, management withheld the raises for his failure to promote. Bradbury testified that management viewed his skin condition as a problem strictly between Bradbury and his doctor and that they ordered him to continue training in the control room.

The condition began to dominate Bradbury's life. He increasingly dreaded treating himself and even feared hospitalization. Finally, Brewer demoted Bradbury from auxiliary operator to maintenance. Bradbury testified the demotion was because he was not seeking to progress into a full-time control room job. The company claimed that auxiliary operator is a training position for "C" operator and that it required the employees to promote to the full-time control room positions. However, Bradbury showed that at least two "non-handicapped" individuals were not promoted but remained as auxiliary operators. He further stated that his supervisors could easily have accommodated his condition by allowing him to remain as an auxiliary operator. Bradbury claims that he was discriminated against by CP & L due to his skin condition, which kept him from moving up in the company and which eventually caused CP & L to terminate him.

The trial judge made the following findings of fact and conclusions of law:

[Mr. Bradbury] is a handicapped person as defined by § 2.01(7)(A) of the Commission on Human Rights Act.

CP & L has engaged in unlawful employment practices against Plaintiff in the following particulars:

a. in refusing to reasonably accommodate Plaintiff's handicap;

b. in discharging Plaintiff because of his handicap;

c. in discriminating against Plaintiff in terms of compensation and conditions of employment on the basis of handicap.

See TEX.REV.CIV.STAT.ANN. art. 5221k, §§ 5.01(1), 6.01(d).

The question specifically presented by this appeal is whether Mr. Bradbury's skin condition qualifies as a handicap, thus entitling him to the protections against discriminatory employment practices proscribed by the statute. See Chevron Corp. v. Redmon, 745 S.W.2d 314, 315 (Tex.1987). By its first point of error, appellant argues that the evidence is both legally and factually insufficient to demonstrate that Bradbury is handicapped as defined by the Act. We review the legal sufficiency of the evidence by examining only the evidence and inferences which support the finding, disregarding all evidence and inferences to the contrary, and determining if there is more than a scintilla of evidence to support the finding under the statute. Weirich v. Weirich, 833 S.W.2d 942, 945 (Tex. 1992). We find that Bradbury did not present legally sufficient evidence to show that he was handicapped.

Bradbury's dermatologist, Dr. Sotelo, testified that atopic dermatitis is a fairly common chronic skin condition, afflicting between two and twenty percent of the population. It is inherited in the same way as hay fever, migraines, and asthma are inherited. He defined dermatitis as an inflammation of the skin, and "atopic" as a term describing a non-localized type of disease from a group of allergic or associated diseases. The condition is marked by flare-ups and remissions which can be spontaneous, and it is treated with medication and moisturizing creams (often cortisone based). He said that Bradbury's condition is a moderate-to-severe one and had been well-managed with cortisone injections, cortisone creams, and Prednisone. However, the condition can be exacerbated

and can spread over the entire body, which is very serious.

Bradbury testified that he has had the condition since childhood and that he knows how to manage it. Most frequently, he treats himself with moisturizers and by taking long baths followed by debridement. He goes to the doctor for "bad flare-ups" and sometimes gets cortisone shots as both a treatment and as a preventative measure. Dr. Sotelo stated that the skin condition precluded Bradbury from participating in social and economic life, but that it did not preclude him from being gainfully employed or from achieving independence. Sotelo stated that Bradbury was "impaired because he had a distressing chronic skin condition that he's going to have to live with for the rest of his life." However, the doctor also testified that Bradbury is able to perform normal functions so that he is not incapacitated. Sotelo further explained that the cold, dry air in an air conditioned environment could exacerbate Bradbury's condition. Bradbury could only work in an air conditioned environment if the humidity and temperature were within a comfort zone. Moreover, the condition limits his performance of work related functions because he must be careful about the things he contacts at work. Sotelo presented a list of substances, composed by him at Bradbury's request, that irritated Mr. Bradbury's skin. The list included a number of solvents and cleansers that Bradbury works with. CP & L adduced testimony that many people without the condition suffer skin irritation from contact with solvents and cleansers.

█ The Act gives the following definitions applicable here:

"Handicapped person" means a person who has a mental or physical handicap, including mental retardation, hardness of hearing, deafness, speech impairment, visual handicap, being crippled, or any other health impairment that requires special ambulatory devices or services....

"Handicap" means a condition either mental or physical that includes mental retardation, hardness of hearing, deafness, speech impairment, visual handicap, being crippled, or any other health impairment that requires special ambulatory devices or services....

Tex.Rev.Civ.Stat.Ann. art. 5221k, § 2.01(7)(A), (B).

Bradbury limited his suit against CP & L solely to claims under the Act. Upon discovery requests, Bradbury admitted that his claimed handicap was not based upon mental retardation, hardness of hearing, deafness, speech impairment, visual handicap, being crippled, nor upon any health impairment requiring special ambulatory devices or services. Bradbury's discovery admission would ordinarily act as a judicial admission against him. Testimony about the special medications and treatment Bradbury required came in without objection from appellant. Bradbury would assert that this constitutes some evidence of a handicap based upon an "other health impairment that requires special ambulatory devices or services," which contradicts his admission. See Hurlbut v. Gulf Atl. Life Ins. Co., 749 S.W.2d 762, 765 (Tex.1987). Still, we have difficulty holding that prescription drugs, office visits, and even cortisone injections constitute "special ambulatory devices or services" which the statute requires for a condition to be considered a handicap under the Act.

█ The Fifth Circuit has held that this section of the Act must be interpreted by the rule of *ejusdem generis*. The principle of statutory construction states that when general words follow an enumeration of persons or things, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned. *Hilton v. S.W. Bell Tel. Co.* 936 F.2d 823, 828 (5th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 913, 116 L.Ed.2d 813 (1992). "The rule is one of limitation, restricting general terms, such as any other, which follow specific terms, to matters similar to those specified." *Hilton,* 936 F.2d at 828. In applying the *ejusdem generis* rule, the statute's use of the word

"ambulatory" as a modifier of both "devices" and "services" is crucial.[1] "Ambulatory" pertains to "walking" or a person who is able to walk or move about. WEBSTERS NEW TWENTIETH CENTURY DICTIONARY 56 (2d ed. 1980). The record contains no evidence that Bradbury's condition is a health impairment that requires special ambulatory devices or services as defined under the Act. TEX.REV.CIV. STAT.ANN. art. 5221k § 2.01(7)(B). The *Redmon* Court defined handicap as a condition "which is generally perceived as severely limiting one in performing work-related functions in general." Some of the evidence did indeed show that Bradbury suffers greatly from a capricious ailment, which, in the air-conditioned work environments common to South Texas, can cause him severe difficulty. Still, we cannot disregard the statutory requirement that an "other health impairment" be characterized by the need for "special ambulatory devices or services." Such an impairment, if it is generally perceived as severely limiting the performance of work-related functions would constitute a handicap under *Redmon*. However, we find no evidence showing that Bradbury's condition required special ambulatory devices or services as contemplated by the language of the Act. He therefore did not meet his burden of proving he was handicapped under the statute. We sustain appellant's first point of error. Accordingly, we reverse the judgment of the trial court and render judgment for appellant.

---

1. Appellee Bradbury states that the determination of handicap is generally a question of fact and cites *Redmon*. *Redmon*, 745 S.W.2d at 318. In *Redmon*, the trial court entered a summary judgment for the employer, which the Court of Appeals reversed. The Supreme Court of Texas affirmed the trial court's judgment in favor of the employer holding that, while the determination of handicap is usually a question of fact for the fact finder, Redmon's health condition did not constitute a handicap as a matter of law. *Id.*

The Court further stated that "a handicap is a condition which is generally perceived as severely limiting one's ability to perform work-related functions in general." *Id.* This definition was adopted from an Illinois case which interpreted a similarly worded statute in which "handicap" was not defined. The issue in Redmon was whether the plaintiff's 20/60 vision constituted a "visual handicap" under the Act.