John F. PHELPS, Plaintiff–Appellant,

v.

FIELD REAL ESTATE COMPANY, Bank Western, Western Capital Investment Corporation, W. Douglas Poole, Norman Marsh, and One or More John Coe Defendants, Defendants–Appellees.

No. 92–1029.

United States Court of Appeals, Tenth Circuit.

April 16, 1993.

Christopher N. Mammel (Steven G. York, with him on the brief), Pryor, Carney & Johnson, P.C., Englewood, CO, for plaintiff-appellant.

Jeffrey T. Johnson (Charles R. Jaeger and Robert E. Benson, with him on the brief), Holland & Hart, Denver, CO, for defendants-appellees.

Before TACHA and BRORBY, Circuit Judges, and BROWN, Senior District Judge.[*]

WESLEY E. BROWN, Senior District Judge.

Plaintiff–Appellant John Phelps (Phelps) sought recovery for an alleged violation of Section 510 of ERISA, 29 U.S.C. § 1140, which prohibits discrimination against participants of any employee benefit plan for the purpose of interfering with rights under such plan. He also sought damages for alleged discrimination under a Colorado statute prohibiting employer discrimination against those with handicaps, C.R.S. § 24–34–402(1)(a).[1]

Phelps began work as a commercial real estate division manager for defendant Field

Real Estate Company in February, 1985.[2] In November, 1986, he learned that he had tested positive for the virus which causes the disease Acquired Immuno–Deficiency Syndrome (AIDS). On August 4, 1989, Phelps was discharged from his employment, and this resulted in his loss of insurance benefits.

The district court found that Phelps had failed to prove the requisite intent to violate 29 U.S.C. § 1140 and that he had likewise failed to prove that he was discharged or discriminated against in violation of Colorado law. *Phelps v. Field Real Estate,* 793 F.Supp. 1535 (D.Colo.1991).

Phelps contends that the district court misconstrued the nature of the showing required for liability under ERISA § 510, and that under the facts found by the trial court, Phelps met his statutory burden of proof under the Colorado handicap discrimination statute. In this respect, Phelps accepts the findings of fact as found by the district court, but contends that its conclusions of law from those facts are erroneous.

A summary of the district court's findings of fact establishes this sequence of events:

Prior to February, 1985, when he began working for defendant Field Real Estate, Phelps had obtained an M.B.A. from Arizona State University, served two years in Vietnam, and began work as a real estate salesman in Pueblo, Colorado, in 1974. In 1979, he began work with Fuller & Company in Denver, selling commercial real estate, including undeveloped land. He obtained a real estate broker's license in 1983 but wanted to move into management; and, following an interview with Ray Stanley, then president of Field Real Estate

[*] The Honorable Wesley E. Brown, Senior United States District Judge for the District of Kansas, sitting by designation.

1. John Phelps died on July 6, 1992, and Jay A. Swope was appointed as his personal representative by the Probate Court of Denver, Colorado. Mr. Swope has been substituted as appellant in this appeal.

2. Defendant Western Capital Investment Corporation was formed as a savings and loan holding company to own and operate subsidiaries Bank

Western, a federal savings bank, Field Real Estate Company, Field Mortgage Company, Institutional Investors Corp. and Western Insurance Service, Inc.

Defendant W. Douglas Poole became Chairman of the Board and Chief Executive Officer of Field in November, 1974. Defendant Norman Marsh was Executive Vice–President and Secretary–Treasurer of Field, responsible for personnel matters, and reporting directly to Poole.

Company, in February, 1985, he entered the Field organization as vice president of the commercial real estate division at $60,000 per year plus 3.5% commission with a guarantee of $82,000 during the first two years. At this time, W. Douglas Poole was chairman of the board and chief executive officer of Field.

When Phelps began work, a job specification was created for the commercial real estate division manager. Under this, the position was described as general management of the division without any direct selling, in accordance with Phelps' wishes.

The commercial real estate division was divided into a commercial sales division and a commercial leasing division. Phelps was manager of commercial sales and reported directly to Poole, while Ray Stanley was manager of commercial leasing.

At the outset, there was some conflict with Poole as to the expected volume of business which would be generated. Phelps believed that each sales agent could be expected to generate $2 million in sales per year, while Poole stated he expected $8 million per agent in each year. Poole's background was in retail sales, and he had had no experience in the real estate business. However, the two appeared to get along well; and Poole felt that Phelps did a good job in 1986 and 1987.

In November, 1986, Phelps learned that he was infected with the AIDS virus; but he was not ill, he had no symptoms of disease, and his condition did not interfere with his ability to perform his job. He kept his infection secret and did not disclose his medical condition to anyone.

By letter dated January 22, 1987, Poole extended Phelps' employment letter with the same compensation and benefits except that Phelps was to be granted listing agreements, beginning with the "Midland Building." Additional listing agreements were to be selected by Poole.

Annual performance evaluations were made by Poole, rating employees from 5 down. Poole gave Phelps mostly 3's for the 1986 evaluation. The only written comment under "areas for growth" was "needs to take a more hands-on approach to job."

On May 8, 1987, Phelps and Norman Marsh, manager of accounting, administration and personnel and assistant to Poole, were made senior vice presidents of Field.

In the annual review for 1987, Phelps was given mostly 4's, with note that Phelps needed "more personal involvement in development of third party business," and that he needed to reduce his outside activities in order to concentrate on developing the commercial sales division. Poole resented the time that Phelps spent away from the office, but he and Phelps continued to have a good working relationship.

In March, 1988, Poole found an anonymous note on his desk from "Members of the Staff," advising that Phelps had a fatal blood disease and requesting that he be transferred. When Phelps was shown the note, he told Poole that the note was true, that he had kept his condition a secret, and that he was concerned about his job and keeping his insurance. Poole assured Phelps that the matter would be kept in confidence and that, so long as Phelps was at Field, he had nothing to worry about.[3]

Poole was concerned about Phelps' condition; the matter was discussed at a board meeting on May 3, 1988, and Poole and Phelps had another meeting on May 24, 1988. Phelps spoke of his disease as "diminished lymphoma," a phrase with no medical meaning, and told Poole that it involved a dormancy period of 8 to 10 years, and that when the disease became active, there would be 2 to 3 years of productivity and then death. Poole was concerned with corporate liability; and, because there was a possibility Field might be sold, there could be a problem about securing "key man" insurance for Phelps.

In June, 1988, Phelps went to see Dr. Kerr about the problem of obtaining insurance and obtained a letter from him which

3. The trial court accepted Phelps testimony regarding the substance of this meeting with Poole.

concealed more than it revealed.[4] The doctor's letter stated in pertinent part that:

> The tests for which I am aware of in (Phelps') case indicate that, although currently able to perform all the duties of your occupation, owing to your past exposure to potentially injurious agents, you are at increased risk for certain types of cancers and other conditions. It is my opinion that the agents detected by the tests which I am aware of are likely to be discovered in the course of the routine tests that are generally administered to determine an individual's insurability, and that it is highly likely that an insurer would decline to issue a policy to you on this basis.
>
> Again, I would wish to emphasize that, from a medical standpoint, you are presently able to satisfactorily perform all of the duties of your current position, and that your condition does not pose any health threat to anyone whom you may encounter in the workplace.

The doctor's letter was given to Poole, and Poole stated that he was "completely satisfied" that Phelps was capable of doing his job.

On July 10, 1988, Poole placed a blind classified ad for a "real estate commercial division manager." The job description was applicable to Phelps' position, and also to Stanley's position, the leasing manager. Other anonymous notes appeared; there was some conflict between Poole and Phelps, and on July 23 and 24, Poole met with managers and real estate agents and informed them he was considering a new division to handle "REO properties," properties with defaulted loans. One agent asked Poole why he had called the meeting. Poole stated "that some people thought Phelps' job was in jeopardy, but it wasn't."

In January, 1989, there was another annual evaluation of employees. Phelps was given 4's on all categories, but under "performance" Poole wrote the following:

> The Commercial Sales division's development over the past three years has been very poor—both from the standpoint of recruiting productive agents as well as meeting Company objectives growthwise.

Phelps was allowed to write and place a rebuttal of this evaluation in his file. In this rebuttal, Phelps admitted that the Commercial Division had lost money in 1988, but he attributed the loss to three external causes—a decline in Denver's overall economy; market prices declining below Bank Western's inventory prices; and loss of confidence by the sales force due to the classified ad for a "commercial division manager," which resulted in the loss of two sales agents.

The district court found that sales performance was adversely affected by general market conditions, and that the Bank was "very reluctant to accept offers on bank property which had been acquired through foreclosures at any price less than the book value." This was because the bank did not want to record a loss, "which could have a negative effect" on bank regulators.

On August 2, 1989, Phelps found the following memorandum under his office door, purportedly from Poole, concerning "Management Changes":

> I am please (sic) to announce that a very capable individual from a major national brokerage firm has agreed to join Field Real Estate Company as our general manager for sales and leasing. His arrival shall be very soon.
>
> Of course, many changes will be taking place. Present managers will have their responsibilities changed and in a limited number of circumstances some positions may be merged or eliminated. . . . .

Poole did not write this memorandum; and, while he had been planning a reorganization, "he was outraged at this leak and premature disclosure." Poole also tried to retrieve copies of the purported memorandum which had been distributed to a small group of management.

---

**4.** At the doctor's request, Phelps drafted this letter and, after making some changes, the doctor signed it. There was no mention of the AIDS virus, and all references to future risk were related to an example based upon blood tests relating to the presence of "Agent Orange".

The Field Board of Directors met on August 4, 1989, and Poole presented a plan to restructure the commercial sales and leasing division into three divisions, adopting a more specialized approach. Gene Goodstat who had been hired in mid-July would head the industrial division, Ray Stanley was to manage the retail division, and an office division was to be directed by Tony Leuthold who had been hired to begin August 7. Phelps was to be relieved effective immediately. The board had reservations about Stanley because of past performance, and he was counseled that his future was limited. Stanley left the company a few months later.

Marsh and Poole met with Phelps on August 4, 1989, to tell him he was being discharged because of poor performance of the division and because of the reorganization. Phelps asked if they knew they were firing someone with AIDS and that terminating his job would also terminate his insurance benefits. Poole's response was that he was sorry, and Poole and Marsh both stated that they did not know that Phelps had AIDS. Marsh suggested that Phelps could stay on as a real estate agent, working on commissions, and then he could continue his insurance at his own expense. Phelps declined to do so. This offer was repeated by letter of August 17, 1989, but it was rejected and Phelps filed this action on November 21, 1989.

### The ERISA Claim

■ Section 510 of ERISA, 29 U.S.C. § 1140, provides in part that:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... *for the purpose of interfering with*

*the attainment of any right to which such participant may become entitled under the plan....* (Emphasis supplied)

As noted by the district court, Phelps was required to prove, by a preponderance of the evidence, that his discharge was motivated by an intent to interfere with employee benefits protected by ERISA.[5] Cf. *Conkwright v. Westinghouse Elec. Corp.,* 933 F.2d 231, 235 (4th Cir.1991). In order to establish this intent, the courts have looked to circumstantial evidence surrounding the employment decision because there is rarely direct evidence of wrongful intent. *Gavalik v. Continental Can Co.,* 812 F.2d 834, 851 (3rd Cir.1987), *cert. den.* 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492, and *Dister v. Continental Group, Inc.,* 859 F.2d 1108, 1112 (2nd Cir.1988).

Since Poole was the one who personally made the decision to discharge Phelps, the question thus was whether Poole fired Phelps because "at least in part," Poole wanted to protect the benefit plans from the effect of Phelps' health condition. As noted by the district court, "(p)ut bluntly, was Poole motivated to save the costs of health care, disability and death benefits as the expected consequences of the plaintiff's developing AIDS?"

Phelps contends that his appeal "is based entirely, and only, upon the facts found and accepted by the trial court".[6] As a part of its findings, the district court determined that Poole in fact was aware that Phelps had AIDS, but that this was not the motivating factor for Phelps' discharge. In this respect, the district court found that "sales performance was a serious problem in the summer of 1988," and that placement of the ad for a new manager on July 12, 1988, "was an awkward effort to motivate Phelps to resign." The court found that "(f)or whatever reason, Poole failed to con-

---

**5.** The parties stipulated that Phelps participated in employee benefit programs, which included health insurance, life insurance, and long-term disability plans, all of which were governed by ERISA.

**6.** During the trial, the court stated the case in this manner:

Trials of this nature are considerably different because in a very real sense what happened here is not so much in dispute. It's why it happened. And what this case involves is something of a trial of the soul, and that's not easily proved what people do in the recesses of their own souls. Yet that's the inquiry that I must make. (Vol. II, Aplt. Appendix, p. 380)

front Phelps directly about his health. The lack of candor between these two men affected the working relationship between them. Yet, a failure of leadership or ineffective management of this difficult situation is not equivalent to discriminatory treatment for the purpose of protecting the assets of the employee plans."

While there was evidence concerning the possible effect of an AIDS patient on benefit plans, the record supports the district court's conclusion that there was "no evidence that Poole, Marsh or anyone else in Field's management made any such calculations or even expressed any awareness of such consequences," and we agree that it is also significant that Phelps' termination was not made until more than fourteen months after he first disclosed his medical condition. In addition, the evidence was that the commercial sales division failed to meet the expectations of Poole and his board of directors. Whether or not this was in fact Phelps' fault, the fact remains that the commercial sales and leasing department was completely reorganized into three divisions, with new employees heading the industrial and office divisions, with Ray Stanley in charge of the retail division. It is significant that Stanley was warned that his future was limited and that he, too, left the company soon after the reorganization.

Under this evidence, the district court's conclusion that Phelps had failed to prove the intent required by Section 510 of ERISA was correct.

### The Colorado Statutory Claim

■ Phelps also claims that he is entitled to recover for handicap discrimination under the Colorado Statute C.R.S. § 24–34–402(1)(a) which provided that it was "a discriminatory or unfair employment practice,"

> (a) for an employer to refuse to hire, to discharge, to promote or demote, or to discriminate in matters in compensation against any person otherwise qualified because of handicap, race, creed, color, sex, national origin, or ancestry, but, with regard to a handicap, it is not a discriminatory or unfair employment practice for an employer to act as provided in this paragraph (a) if there is no reasonable accommodation that the employer can make with regard to the handicap, the handicap actually disqualified the person from the job, and the handicap was a significant impact on the job....

In this case, the defendants agreed that having AIDS or being HIV-positive was a handicap within this statute; but a plaintiff must prove that the employer knew or should have known of the handicap and a need for accommodation. See *Nathanson v. Medical College of Pennsylvania*, 926 F.2d 1368, 1381–82 (3rd Cir.1991) involving similar law.[7] Here, Phelps was HIV-positive, but without illness, and could perform all of the duties of his employment. He did not ask for any special consideration and, in fact, wished to keep his condition private and secret. There was no question of "accommodation" for his handicap because it did not affect his physical ability to perform. In addition, as discussed above, it is clear that the decision to terminate Phelps was based upon a legitimate business decision to reorganize his department.

The findings of the district court are fully supported by the record and are not

---

7. It appears that defendants here agreed that Phelps would be covered by the Colorado Statute. See, however, *Hilton v. Southwestern Bell Telephone Co.*, 936 F.2d 823 (5th Cir.1991), *cert. den.* —— U.S. ——, 112 S.Ct. 913, 116 L.Ed.2d 813, involving a Texas statute which prohibited discrimination against those with handicaps. There a drafting clerk tested HIV positive, but was capable of performing all of his duties at work, but because he had developed a very low, "life threatening" blood platelet count, even sedentary jobs were "implausible," since any small bump or bruise could be fatal. The court found that while Hilton was "totally disabled," he was not a "handicapped person" under the Texas statute.

Southwestern Bell treated all of its employees with AIDS-related conditions as disabled and provided long-term disability plans with medical insurance for such employees. In August, 1989, Southwestern had 18 employees in the Dallas division who had been diagnosed with AIDS, and 11 of those were still working. See footnote 3, 936 F.2d at 827.

clearly erroneous.[8]  The judgment is AFFIRMED.

---

8. Phelps moved to certify questions to the Colorado Supreme Court concerning the interpretation of C.R.S. § 24–34–402 discussed *supra*.

The issues raised in Phelps' appeal solely involve questions of fact.  Following our review of the record, we have determined that the district court properly found that Phelps had failed to establish that defendants had violated ERISA provisions, or the state statutory provision.  In view of the finding that plaintiff was terminated for non-discriminatory reasons, the Motion for Certification is denied.