Timothy McNEEL, Plaintiff,

v.

**PUBLIC SERVICE COMPANY OF COLORADO, Defendant.**

Civil Action No. 93–K–2304.

United States District Court, D. Colorado.

April 30, 1996.

1318

George C. Price, Denver, CO, for Plaintiff.

Elizabeth I. Kiovsky, Sherman & Howard, Denver, CO, for Defendant.

## MEMORANDUM OPINION AND ORDER

KANE, Senior District Judge.

Plaintiff asserts three claims for relief against his former employer in this ADA/ERISA discrimination action. Before me is Defendant's Motion for Summary Judgment. Briefing was complete on January 5, 1996. I have reviewed the briefs[1] and the record in this case, and determine that oral argument would not be helpful. I grant the motion.

## I. SUMMARY JUDGMENT STANDARDS

■ Rule 56(c) of the Federal Rules of Civil Procedure permits entry of summary judgment where the pleadings, depositions, answers to interrogatories and admissions on file, together with any affidavits, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). The facts presented, and appropriate inferences that may be drawn from them, must be construed in the light most favorable to the nonmoving party. *Id.* If a reasonable trier of fact could not return a verdict for the nonmoving party, summary judgment is proper. *Celotex v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986).

■ The very purpose of a summary judgment action is to determine whether trial is necessary. *White v. York Int'l Corp.*, 45 F.3d 357, 360 (10th Cir.1995).[2] To avoid summary judgment, the nonmoving party therefore must refer to specific facts, beyond those in the pleadings, and demonstrate the existence of a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553; *White* at 360. Unsupported allegations without "any significant probative evidence tending to support the complaint" are insufficient, *see White* at 360 (internal quote and citation omitted), as are conclusory assertions that factual disputes exist. *Anderson*, 477 U.S. at 247–48, 106 S.Ct. at 2509–10 (1986).

## II. FACTS

Plaintiff Timothy McNeel was an employee of Defendant Public Service Company of Col-

1. The quality of McNeel's brief in response to Public Service's Motion for Summary Judgment is minimal. The court's copy was submitted without a signature page, there are no citations to the record, and the legal citations are inadequate or wrong. McNeel's only effort to set forth specific facts showing there is a genuine issue for trial is with his own affidavit. I cannot discern whether the text of McNeel's affidavit was copied into the fact section of his response brief or whether the brief section was copied into the affidavit. Either way, the two are identical (to and including grammatical errors such as "Mr. Severts [sic] attitude toward me changed"). *Compare* Resp.Br. at 2 *with* Affid. at 2.

2. As stated by Professor Edson R. Sunderland, University of Michigan Law School and member of the Supreme Court Advisory Committee, on Friday, July 22, 1938 at the Proceedings of the Institute on Federal Rules, A.B.A. Western Reserve University: "In such cases summary judgment may be rendered when it appears in the case that there is in fact no issue to be tried."

orado, Inc. ("Public Service") from April 3, 1990 through July 23, 1992, when he was laid off. McNeel asserts three claims for relief against Public Service: (1) discrimination and retaliation in violation of his rights under Title I of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. §§ 12112, 12203; (2) discrimination and retaliation in violation of his rights under the Rehabilitation Act of 1973; and (3) discrimination to avoid paying medical costs associated with his alleged disability in violation of the Employee Retirement Income Security Act, 29 U.S.C. §§ 1001 et seq.

McNeel was initially hired as a senior writer in the Client Services Unit of Public Service's Public Affairs Department. His immediate supervisor was Su Hawk. Effective January 1, 1991, McNeel's job title changed to Client Services Consultant, but his duties remained substantially the same. McNeel Dep. (Attach.Def.'s Mot.Summ.J.) at 42–43.

McNeel was suspended for one day in November 1990 as a result of certain computer generated or "E-mail" messages he wrote containing inappropriate sexual and religious comments about Hawk. See Memorandum to McNeel from Volstad (Attach. A, Def.'s Mot.Summ.J.); McNeel Dep. at 108–112. McNeel was counseled again in April 1991 for unprofessional conduct, including the making of allegedly sexist and racist remarks to clients which were reported back to management. See Memorandum to McNeel from Hawk (Attach. C, Def.'s Mot.Summ.J.). Hawk rated McNeel "unsatisfactory" in his April 1991 performance review as a result. See id., Attachs. B & C.

McNeel underwent liver enzyme tests beginning in June 1991 and in August was diagnosed with hepatitis C. The condition, McNeel states, causes fatigue and loss of appetite and may ultimately require a liver transplant. McNeel discussed his condition, and his potential treatment needs, with Hawk.

In September 1991, McNeel began reporting to Mark Severts, Director of Media and Customer Communications. McNeel's February 1992 performance evaluation improved significantly, with Severts rating him "fully competent." Severts Affid. (Attach. H, Def.'s Mot.Summ.J.) ¶ 4. Severts maintains, and McNeel concedes, that Severts was aware of McNeel's medical condition throughout the time McNeel worked for him and that it did not affect his evaluation of McNeel's performance, which was positive. Id.; McNeel Dep. at 140.

By April 1992, McNeel learned the Communications Division was going to be reorganized into a new division called Corporate Communications. McNeel Dep. at 155. As part of the reorganization, most of the Communications Division positions were revised and all but a few employees (including McNeel) were required to apply for new positions. Id. at 162–63; see Job Posting Packet (Attach. E, Def.'s Mot.Summ.J.). The application process required applicants to rate their applications in order of preference. McNeel applied for nine positions, none of which reported to Su Hawk. At his deposition, McNeel agreed that "[Hawk] didn't want [him] working for her, and [he] didn't want to work for her." McNeel Dep. at 151 (agreeing with counsel's statement).

Four of the positions reported to Thomas Currigan, Director of External Affairs. See Currigan Affid. (Attach. G, Def.'s Mot. Summ.J.). Currigan asserts he was unaware of McNeel's medical condition at the time he selected other individuals for the positions. Id., ¶ 2. He states he based his decisions (1) on the fact McNeel had been disciplined for unprofessional conduct related to the "E-mail" incident; and (2) on his belief that McNeel's experience did not compare as favorably as that of the other applicants. Id., ¶¶ 4–11.

Four of the other positions for which McNeel applied reported to Severts. See Severts Affid. (Attach. F). Severts was aware of McNeel's condition, but states he selected other applicants over McNeel because he felt they were more qualified. Id., ¶¶ 8–14. McNeel does not dispute that the individuals selected were "as qualified" or "more qualified" than he. See McNeel Dep. at 207–08 (Holubar), 211–14 (Stutz), 265 (Lovato).

McNeel also applied for a position reporting to Stephen Volstad. He suspects he was

not selected for that position because Volstad had a long-term friendship with the individual who was selected, Dan Danbom.[3] McNeel Dep. at 216.

Because he was not selected for any of the reorganized positions, McNeel was laid off on July 23, 1992.

## III. *MERITS*

### A. *ADA/Rehabilitation Act*

The ADA provides that "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability ... in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA defines a "qualified individual" as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* § 12111(8), *applied in White,* 45 F.3d at 360. This language tracks that of the Rehabilitation Act of 1973. *White* at 360 n. 5.

To qualify for relief under the ADA, a plaintiff must establish (1) that he is a disabled person within the meaning of the ADA; (2) that he is qualified, that is, with or without reasonable accommodation (which he must describe), he is able to perform the essential functions of the job; and (3) that the employer terminated him because of his disability.

*Id.,* 45 F.3d at 360–61 & n. 6 (citing *Pushkin v. Regents of Univ. of Colo.,* 658 F.2d 1372 (10th Cir.1981) (discussing *prima facie* case)), *applied in Williams v. Widnall,* 79 F.3d 1003 (10th Cir.1996) (plaintiff failed to establish *prima facie* case). To "sharpen the inquiry into the elusive factual question of intentional discrimination," the Tenth Circuit has adopted in the ADA context the burden shifting scheme set forth in *McDonnell*

*Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and its progeny. *See Pushkin,* 658 F.2d at 1386–87 (explained and refined in *White,* 45 F.3d at 361 n. 6).

Accordingly, once plaintiff makes a facial showing that he was a "qualified disabled person" under the ADA, the burden of production shifts to the employer to present a facially nondiscriminatory reason for its employment decision. *See McDonnell Douglas,* 411 U.S. at 802–03, 93 S.Ct. at 1824–25; *Randle v. City of Aurora,* 69 F.3d 441, 451 (10th Cir.1995). If the defendant meets this burden, the presumptions dissolve and plaintiff assumes the normal burden of any plaintiff to prove the employment decision at issue was motivated by discriminatory intent. *White,* 45 F.3d at 361. "As with discrimination cases generally, the plaintiff at all times bears the ultimate burden of persuading the trier of fact that he has been the victim of illegal discrimination based on his disability." *Id.*

At the summary judgment stage, it is plaintiff's burden to establish a *prima facie* case and then to show that there is a genuine dispute of material fact as to whether the employer's proffered reason is pretextual—i.e., unworthy of credence. *Randle,* 69 F.3d at 451 (citing *Ingels v. Thiokol Corp.,* 42 F.3d 616, 622 (10th Cir.1994)). If the plaintiff succeeds, he is entitled to go to trial. *Id.*

The burden of establishing a *prima facie* case of discrimination is "not onerous," *see Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981), and, for the purposes of summary judgment, I will assume McNeel has met that burden here.[4] I also find Public Service has proffered facially nondiscriminatory reasons for discharging McNeel after it decided not to select him for any of the positions for which he applied after the reorganization. Thus, the question to be decided is whether McNeel has come

---

**3.** Danbom, too, was involved in the "E-mail" incident.

**4.** Although Public Service denies McNeel is disabled as that term is defined in the ADA, *see*

Pretrial Order at 3–4, it concedes the point for the purpose of its Motion for Summary Judgment.

forward with sufficient evidence of pretext to survive summary judgment.

Pretext may be established in an employment discrimination case by evidence showing either "that a discriminatory reason more likely motivated the employer or ... that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. at 1095. The only evidence offered by McNeel on the issue of pretext is his own affidavit.

McNeel asserts the reasons offered by Public Service for not hiring him in a new position after the reorganization were pretextual because he was a good employee who had "consistently received accolades" for his work. Affid. at 3. He maintains he was qualified for the positions for which he applied, and asserts they were "filled by people who did not even apply for them." *Id.*

According to McNeel, the fact Stutz and Danbom (the other "E-mail" participants) were retained while he was not creates a triable issue regarding the credibility of Currigan's professed "concern" about McNeel's judgment and lack of professionalism. Severts, McNeel contends, went from being "warm and friendly" to "distant and not friendly" after learning of his liver condition. *Id.* He "expressed concern about the medical condition and on a number of occasions would ask if it was contagious." *Id.* He also expressed "concern about work performance and lost time." *Id.* McNeel argues this "change" in "attitude" also creates a triable issue as to Severts' motivation in not hiring him in a new position.

Finally, McNeel asserts Hawk made discriminatory comments to him such as "you do not sound sick to me" and "[you] should go to bed earlier" when he said he was fatigued because of the hepatitis. He also attributes comments about the company's antipathy for employees taking excessive time off for illness to Hawk. McNeel Affid. at 2.

This "evidence" is only arguably sufficient to establish a *prima facie* case of disability-based discrimination; it falls far short of creating a triable issue on the question of Public Service's intent. Hawk was not involved in the hiring or discharge decisions of which McNeel complains. Even if her comments could be construed as discriminatory, it is well settled that discriminatory remarks by a manager not involved in a termination decision are insufficient to avoid entry of summary judgment. *See Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 529 (10th Cir.1994).

With respect to McNeel's assertion that the positions were filled by people who hadn't applied for them, there is nothing in the record to support the assertion and McNeel's conclusory allegations are insufficient to survive summary judgment. *See White,* 45 F.3d at 360.

The fact the other "E-mail" participants were retained while McNeel was not is also insufficient, by itself, to create an inference of discriminatory intent. The manager who gave the "E-mail" incident as a reason for not selecting McNeel, Currigan, was not involved in the decision to retain Stutz and Danbom. *See* Currigan Affid. ¶¶ 6–11 (Danbom and Stutz were not considered for the positions for which McNeel applied). Currigan denies he was aware of McNeel's medical condition at the time he decided to select others for the positions, and states his decision was also motivated by his conclusion that McNeel's experience, with the exception of Lovato, did not compare to that of the other applicants.[5] McNeel addresses neither of these assertions in his response. McNeel's failure to challenge the qualifications of those hired is also significant in this regard.

Because McNeel has failed to create a triable issue on the question of pretext, I grant Defendant's Motion for Summary Judgment on his ADA and Rehabilitation Act claims.

### B. *ERISA*

Section 510 of ERISA provides in part:

---

5. Currigan states he hired Lovato over McNeel for the Senior Communications Officer—Environmental Communications position because while McNeel had skills "equal to" Lovato's, the position was Lovato's second choice but McNeel's sixth and Lovato had a "stronger desire for the position." Currigan Affid. at ¶ 9. Currigan stated the selection of Lovato was "also influenced" by his concerns about McNeel's professionalism. *Id.*

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....

29 U.S.C. § 1140. As in ADA and other employment discrimination cases, a plaintiff must prove his discharge was motivated by invidious intent in order to prevail on a § 510 claim. *Phelps v. Field Real Estate Co.*, 991 F.2d 645, 649 (10th Cir.1993) (affirming entry of summary judgment in favor of employer who discharged employee infected with AIDS virus). The issue in a discriminatory discharge case is whether plaintiff was discharged to prevent him from receiving benefits. *Hopkins v. Seagate*, 30 F.3d 104, 106 (10th Cir.1994) (citing *Phelps*).

In *Phelps*, plaintiff offered no evidence that defendants had calculated or were even aware of the effect his medical condition would have on the benefit plan. This failure, together with the fact plaintiff's termination did not occur until over 14 months after he first disclosed his condition, were deemed "significant" factors favoring the entry of judgment against plaintiff. *Id.* In the present case, McNeel states that "it was clear" from conversations with Monique Lovato, a non-management employee in the public affairs department, "that thigh [sic] medical costs were a significant concern to [the company] and that they were looking for ways to cut costs." Because he had discussed "at length" the high costs of treatment for hepatitis C and the potential need for a liver transplant with Hawk, McNeel asserts he has raised a triable issue on the question of Public Service's motivations for the purposes of his ERISA claim. I disagree.

As an initial matter, Lovato's alleged comments do not create a triable issue on the

question of Public Service's intent. The hearsay statements of a non-management level employee, to the extent they can be considered at all,[6] are of questionable relevance. This is particularly true where, as here, the plaintiff had accrued no significant medical charges at the time of discharge, had not applied for long-term disability or other costly benefits, and was discharged more than one year after he initially disclosed his condition to management. *See* McNeel Dep. at 126–27.

I conclude no reasonable trier of fact could infer from the evidence presented that Public Service discriminated against McNeel because he had hepatitis C or discharged him to prevent him from receiving benefits. Accordingly,

Defendant's Motion for Summary Judgment is GRANTED and the case dismissed. The parties are to bear their own costs.

---

**6.** Rule 56(e) states that "supporting an opposing affidavits shall be made on personal knowledge [and] shall set forth such facts *as would be admissible in evidence.* (Emphasis added.) Because there is no evidence that Lovato was authorized to speak on behalf of Public Service such that her statements could constitute admissions, they should be disregarded. *See Boren v. Sable*, 887 F.2d 1032, 1038 (10th Cir.1989) (statements of nonagency employee inadmissible under Rule 801(d)(2)(D)).