TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-08-00475-CV






Texans Uniting for Reform and Freedom, Appellant


v.


Amadeo Saenz, Jr., P.E., Individually and in his Official Capacity as Executive Director
of the Texas Department of Transportation; Coby Chase, Individually and in his
Official Capacity as Director of the Texas Department of Transportation Government 

and Public Affairs Division; Texas Department of Transportation;

and Texas Transportation Commission, Appellees






FROM THE DISTRICT COURT OF TRAVIS COUNTY, 200TH JUDICIAL DISTRICT

NO. D-1-GN-07-003165, HONORABLE PAUL DAVIS, JUDGE PRESIDING



 

O P I N I O N


 Texans Uniting for Reform and Freedom (TURF) appeals a district court judgment
dismissing, on a plea to the jurisdiction, its suit against appellees Amadeo Saenz, Jr., P.E.,
individually and in his official capacity as Executive Director of the Texas Department of
Transportation; Coby Chase, individually and in his official capacity as Director of the
Texas Department of Transportation Government and Public Affairs Division; the Texas Department
of Transportation (TxDOT); and the Texas Transportation Commission (Commission). In
two issues, TURF argues that the district court (1) erred in granting appellees' plea and (2) abused
its discretion in denying it a continuance and adjudicating appellees' "merits-based" plea through
preliminary proceedings rather than trial. For the reasons explained below, we will overrule these
contentions and affirm the district court's judgment.


BACKGROUND

 Within the last decade, the Texas Legislature has enacted significant changes to the
manner in which Texas's transportation infrastructure is financed, constructed, and maintained.
Among these enactments have been legislation authorizing the Commission to designate a statewide
system of highways, toll roads, and other modes of transportation facilities known as the "Trans-Texas Corridor" (TTC); (1) empowering TxDOT to develop and operate TTC facilities either directly
or through the participation of governmental or private entities (with private participation to be
encouraged "[t]o the maximum extent practical and economical"); (2) and expanding the agency's
power to toll both new and existing state highway infrastructure. (3) However, as TxDOT and the
Commission proceeded with steps to make these sorts of projects a reality, issues related to the
tolling of new or existing roads and the TTC concept proved to be controversial.

 Particularly controversial were TxDOT's plans to build two TTC projects--TTC-35,
which would run roughly parallel to current Interstate 35, and TTC-69, which would run roughly
parallel to current U.S. Highway 59. Simply described, the planning process for each project
included, among other steps, several rounds of public meetings or hearings to elicit public input
concerning whether the project should be built in particular areas and the viability of alternative
potential routes. The process would culminate in either a "no-build option" or a "tier one"
environmental-impact statement concerning a several mile-wide "preferred corridor," which would
be submitted for approval by the Federal Highway Administration. Assuming the project proceeded
through "tier one," the process would essentially be repeated in a "tier 2" in which the environmental
impact of specific routes and transportation facilities would be assessed.

 As this process continued, in the latter half of 2006 TxDOT hired a marketing firm
to provide creative services, media placement, and website development for what appellees term
"a statewide public information effort to inform and educate the public about meeting Texas'
transportation needs." In June 2007, an advertising campaign--with the slogan "Keep Texas
Moving"--was launched, with television, radio, print, billboard, and internet advertisements that
emphasized what were portrayed as the need for and benefits of toll projects and the TTC concept. (4)
While some advertising ran statewide, the campaign was focused on cities in or near the TTC-69
study area, and to some extent, major cities along the TTC-35 study area.

 Also, in January 2007, TxDOT contracted with a public affairs consulting firm, the
Rodman Company, to provide communications and outreach concerning the TTC to various specific
audiences at the local, state, and federal levels, including local officials. Among the stated goals of
Rodman's "Texas Outreach" work plan were "to identify highly targeted leadership audiences and
communicate with them directly to improve their understanding of TxDOT's goals and strategies,
and increase support for TxDOT programs--particularly the Trans-Texas Corridor and tolling."
Rodman was also to provide "Federal Outreach" to "educate audiences about issues of importance
to [TxDOT] and the successful implementation of TxDOT's federal legislative agenda." Rodman
also assisted with planning and organizing for TxDOT a series of "town hall" meetings along the
TTC-69 corridor.

 Appellant TURF describes itself as "a non-profit organization whose mission is to
educate the public about the Texas government's new shift to tolling using controversial financing
called public-private partnerships[,]. . . the tolling of existing corridors, . . . the eminent domain
abuse inherent in these claims (confiscating private land to give to a private company for commercial
gain)," and the TTC. TURF adds that it is "a grassroots group of taxpaying Texans who are
asking for reforms that require accountability and good public policy as well as promoting non-toll,
sensible transportation solutions." In September 2007, TURF's founder and director, Terri Hall,
filed an original petition seeking injunctive and declaratory relief to restrain, as illegal, TxDOT's
expenditures of public funds on the KTM campaign or "lobbying" of governmental units concerning
toll roads or TTC projects. Named as defendants were TxDOT's then-executive director and
appellee Chase. The defendants responded with a plea to the jurisdiction asserting, among other
grounds, sovereign immunity and lack of standing. Multiple rounds of amendments to the pleadings
and pleas to the jurisdiction followed. Ultimately, TURF proceeded as the sole plaintiff, naming
appellees Saenz, Chase, TxDOT, and the Commission as defendants. 

 A hearing on the defendants' plea to the jurisdiction was initially set for October 18,
2007. On that day, the district court granted TURF a ninety-day continuance. The hearing was
ultimately reset for March 20, 2008. During the interim, the parties conducted discovery, including
depositions of Saenz, Chase, and other TxDOT employees. Both parties filed discovery products,
affidavits, and other evidence in connection with the pending plea. 

 On the morning of March 20, 2008, prior to the hearing, TURF filed an
amended petition (which also incorporated its evidence by reference) and another motion for
continuance seeking additional time for discovery. The district court took the continuance motion
under advisement and proceeded with the hearing. At the hearing's conclusion, the court also took
the plea under advisement. Approximately two weeks after the hearing, TURF moved to supplement
the record with additional documents.

 The district court ultimately granted both TURF's motion to supplement the record
and appellees' plea to the jurisdiction. It rendered judgment dismissing TURF's suit in its entirety.
This appeal followed.


ANALYSIS

 In two issues on appeal, TURF argues that the district court (1) erred in granting
appellees' plea to the jurisdiction and (2) abused its discretion in denying it a continuance and
adjudicating, at the pretrial stage, appellees' "merits-based" plea to the jurisdiction.


Standard and scope of review


 A plea to the jurisdiction challenges a trial court's authority to decide a case. See
Texas Dep't of Parks & Wildlife v. Miranda, 133 S.W.3d 217, 225-26 (Tex. 2004). Analysis of
whether this authority exists begins with the plaintiff's live pleadings. Id. at 226. The plaintiff
has the initial burden of alleging facts that affirmatively demonstrate the trial court's jurisdiction to
hear the cause. Id. (citing Texas Ass'n of Bus. v. Texas Air Control Bd., 852 S.W.2d 440, 446
(Tex. 1993)). Whether the plaintiff met this burden is a question of law that we review de novo. Id.
We construe the pleadings liberally, taking them as true, and look to the pleader's intent. Id.;
Texas Logos, L.P. v. Brinkmeyer, 254 S.W.3d 644, 659 (Tex. App.--Austin 2008, no pet.). If the
pleadings do not contain sufficient facts to affirmatively demonstrate the trial court's jurisdiction
but do not affirmatively demonstrate incurable defects in jurisdiction, the issue is one of pleading
sufficiency, and the plaintiff should be afforded the opportunity to amend. Miranda, 133 S.W.3d
at 226-27. If, on the other hand, the pleadings affirmatively negate the existence of jurisdiction,
then a plea to the jurisdiction may be granted without allowing the plaintiff an opportunity to amend.
Id. at 227. 

 When resolving issues presented by the plea to the jurisdiction, we may consider
evidence that the parties have submitted and must do so when necessary to resolve the jurisdictional
issues. Bland Indep. Sch. Dist. v. Blue, 34 S.W.3d 547, 555 (Tex. 2000). In fact, in a plea to the
jurisdiction, a party may present evidence to negate the existence of a jurisdictional fact alleged in
the pleadings, which we would otherwise presume to be true. See Miranda, 133 S.W.3d at 227. To
the extent the challenge implicates the merits of the plaintiff's cause of action, the party asserting
the plea has the burden of negating a genuine issue of material fact as to the jurisdictional fact's
existence, in a manner similar to a traditional summary-judgment motion. See id. at 227-28.
Whether the party meets this burden is a question of law that we review de novo. Id. at 228. If the
pleading requirement has been met and the party challenging jurisdiction submits evidence that
implicates the merits of the pleader's cause of action, we take as true all evidence favorable to the
pleader and indulge every reasonable inference and resolve any doubts in the pleader's favor. Id. (5) 

 To invoke the district court's subject-matter jurisdiction, a claimant must have
the standing required by the state constitution. See Texas Ass'n of Bus., 852 S.W.2d at 443-45.
TURF claims associational standing to assert its claims on behalf of its members. To have standing
to sue on its members' behalf, TURF must demonstrate that: (1) its members would otherwise have
standing to sue in their own right; (2) the interests the organization seeks to protect are germane to
the organization's purposes; and (3) neither the claim asserted nor the relief requested requires the
participation of individual members in the lawsuit. Id. at 445-46. At this juncture, the sole disputed
element is whether TURF's members would have standing to sue in their own right.

 To have standing to challenge a governmental action or assert a public right (the sort
of claims TURF asserts on behalf of its members), a claimant generally must demonstrate that he has
suffered a particularized injury distinct from that of the general public. See Bland Indep. Sch. Dist.,
34 S.W.3d at 555-56. However, there is a narrow exception to that rule--a taxpayer has standing
to seek prospective injunctive or declaratory relief to restrain the illegal expenditure of public funds,
even without showing a distinct injury. See id. at 556; Hendee v. Dewhurst, 228 S.W.3d 354, 373-74, 378-79 & n.31 (Tex. App.--Austin 2007, pet. denied). TURF relies on this exception as the
basis for the individual standing of its members. Specifically, TURF asserts--and it appears
undisputed on appeal--that its membership includes state taxpayers who would have individual
standing to sue to restrain ongoing illegal state expenditures. Further, TURF insists, it has stated
claims that appellees are making "illegal expenditures" within the meaning of this exception.

 Importantly, these principles confer standing on taxpayers only to assert claims
to restrain prospective governmental expenditures--money that has not yet been spent. See
Bland Indep. Sch. Dist., 34 S.W.3d at 556-58. As long as the public money has not yet been spent,
the taxpayer is considered to have a justiciable interest in ensuring that the money not be spent
illegally. See id. at 556 ("'When a taxpayer brings an action to restrain the illegal expenditure . . .
of tax money he sues for himself, and it is held that his interest in the subject-matter is sufficient to
support the action . . . .'" (quoting Hoffman v. Davis, 100 S.W.2d 94, 95 (Tex. 1937))). However,
once the money has been spent, a cause of action based on the past expenditures belongs to the
taxing entity alone. See id. The Texas Supreme Court has also explained that this distinction rests
upon a balancing of taxpayers' interests in restraining illegal spending of their tax dollars with the
interest in avoiding disruption of governmental operations. See id. at 555-58.

 Independent from the question of TURF's standing, but somewhat related to it, is
the issue of whether its claims are barred by sovereign immunity. Absent waiver by the legislature,
sovereign immunity generally deprives courts of subject-matter jurisdiction over suits against the
State, its agencies, or officers or employees acting within their official capacity. See City of El Paso
v. Heinrich, 284 S.W.3d 366, 369-76 (Tex. 2009). In its attempt to invoke the district court's
subject-matter jurisdiction, TURF relies on the "ultra vires" exception to sovereign immunity, which
permits a plaintiff to sue a state official in his official capacity (thereby binding the State through its
agent) for prospective injunctive or declaratory relief to restrain the official from violating statutory
or constitutional provisions. See id. at 372-73, 377. Sovereign immunity does not bar such suits
because, in concept, acts of state officials that are not lawfully authorized are not considered to be
acts of the State, and the remedy of compelling such officials to comply with the law, while binding
on the State, "do[es] not attempt to exert control over the state [but] attempt[s] to reassert the control
of the state." Id. at 372-73 (emphasis added).

 To assert a valid ultra vires claim, the claimant "must not complain of a government
officer's exercise of discretion, but rather must allege, and ultimately prove, that the officer acted
without legal authority or failed to perform a purely ministerial act." Id. at 372. Otherwise, the suit,
even if seeking only prospective declaratory or injunctive relief, implicates sovereign immunity
because it seeks to control state action. See id. Additionally, even if the suit complains of ultra vires
actions, the remedy sought cannot have the effect of awarding retrospective monetary relief against
the State or other relief that would independently implicate sovereign immunity. See id. at 369-76;
Creedmoor-Maha Water Supply Corp. v. Texas Comm'n on Envtl. Quality, 307 S.W.3d 505, 515
(Tex. App.--Austin 2010, no pet.).

 As detailed below, TURF complains of the same acts as both "illegal expenditures"
and "ultra vires" acts. With respect to both complaints, it is not enough that TURF pleads or argues
legal conclusions that appellees are violating statutory provisions. Rather, TURF has the initial
burden of alleging facts that affirmatively demonstrate the district court's subject-matter jurisdiction.
See Miranda, 133 S.W.3d at 226. And "we construe the statutory . . . provisions that are implicated,
apply them to the facts [TURF] has pled and that were not negated by evidence [per Miranda], and
determine whether [TURF] has alleged acts that would constitute violations of the relevant . . .
statutory provisions." Creedmoor-Maha Water Supply Corp., 307 S.W.3d at 516 (citing Director
of Dep't of Agric. & Env't v. Printing Indus. Ass'n, 600 S.W.2d 264, 265-70 (Tex. 1980); Hendee,
228 S.W.3d at 368-69)). 

 Before turning to this analysis, however, we observe that TURF's claims against some
of the appellees are barred by sovereign immunity regardless of whether it has otherwise invoked
the district court's subject-matter jurisdiction. The Texas Supreme Court has recently clarified that
an ultra vires suit (1) must be asserted against a state official in his official capacity, and (2) even
while the remedy binds the State and thus has the same practical effect as a judgment against
the State itself, "the governmental entities themselves--as opposed to their officers in their
official capacity--remain immune from suit." See Heinrich, 282 S.W.3d at 373. Thus, even
assuming TURF has standing to assert its claims, it cannot, through reliance on the ultra vires
exception, avoid the sovereign immunity of TxDOT and the Commission. Consequently, its claims
against those appellees are barred unless the legislature has waived that immunity. TURF has not
pled or otherwise demonstrated such a waiver with respect to its ultra vires claims against TxDOT
and the Commission. Although TURF cites prior statements from this Court to the effect that the
UDJA "waives" sovereign immunity with respect to an ultra vires suit, Heinrich and other recent
Texas Supreme Court decisions have clarified that the UDJA's waiver is limited to suits challenging
the validity of certain governmental ordinances or statutes. See id. at 373 & n.6; accord Texas Dep't
of Ins. v. Reconveyance Servs., Inc., 306 S.W.3d 256, 257-59 (Tex. 2010) (per curiam). Accordingly,
we hold, as an initial matter, that the district court did not err in dismissing TURF's claims against
TxDOT and the Commission for want of subject-matter jurisdiction. (6)

 This leaves Saenz and Chase, whom TURF has purported to sue in both their official
and individual capacities. Heinrich again guides us in narrowing the parties and issues in dispute.
In that case, the supreme court indicated that injunctive relief to control a governmental unit's
spending would "necessarily" come from the governmental unit rather than individual members
of its governing body, meaning that the plaintiff must sue an appropriate agent of the unit in his or
her official capacity to obtain that relief. See Heinrich, 282 S.W.3d at 377. The same is true here.
The remedy TURF seeks in its suit--restraining state spending--would lie against Saenz and Chase
in their official rather than individual capacities. TURF's complaints on appeal are limited to
challenging the dismissal of its claims seeking these remedies. To the extent TURF is complaining
about the dismissal of its "individual" claims against Saenz and Chase, it has presented nothing for
review. See Tex. R. App. P. 33.1.

 We now turn to whether TURF invoked the district court's subject-matter jurisdiction
to adjudicate its claims against Saenz and Chase in their official capacities (the "officials").
Specifically, we consider whether the facts TURF has alleged and that were not negated by evidence
constitute violations of the statutory provisions on which TURF relies.



TURF's claims

 On appeal, TURF argues that it stated claims predicated on violations of
three prohibitions in chapter 556 of the government code, as well as violations of the federal
Hatch Act. 


 Government code section 556.004 

 TURF urges that it stated a claim that the officials are violating government code
section 556.004. This section provides: 


Sec. 556.004. PROHIBITED ACTS OF AGENCIES AND INDIVIDUALS.


(a) A state agency may not use any money under its control, including
appropriated money, to finance or otherwise support the candidacy of a
person for an office in the legislative, executive, or judicial branch of state
government or of the government of the United States. This prohibition
extends to the direct or indirect employment of a person to perform an action
described by this subsection.


(b) A state officer or employee may not use a state-owned or state-leased motor
vehicle for a purpose described by Subsection (a).


(c) A state officer or employee may not use official authority or influence or
permit the use of a program administered by the state agency of which the
person is an officer or employee to interfere with or affect the result of an
election or nomination of a candidate or to achieve any other political
purpose.


(d) A state employee may not coerce, attempt to coerce, command, restrict,
attempt to restrict, or prevent the payment, loan, or contribution of any thing
of value to a person or political organization for a political purpose.


(e) For purposes of Subsection (c), a state officer or employee does not interfere
with or affect the results of an election or nomination if the individual's
conduct is permitted by a law relating to the individual's office or
employment and is not otherwise unlawful.


Tex. Gov't Code Ann. § 556.004 (West 2004). A state employee who violates subsections (c) or
(d) of section 556.004 is subject to immediate termination of employment, see id. § 556.007
(West 2004), and a state agency is prohibited from using appropriated funds to compensate such
employees, state officers who violate subsection (c), or state officers or employees who violate
subsections (a) or (b) of section 556.004. See id. § 556.008 (West 2004).

 On appeal, TURF relies on subsection (c) of section 556.004. It asserts that the
facts it alleged in its pleadings that were not conclusively negated by evidence demonstrate that
the officials' "actions in spending public money on the 'Keep Texas Moving' campaign" constitute
a prohibited use of their official authority or influence or the permitting of the use of a program
they administer "to achieve [a] political purpose" within the meaning of this provision. (7) The parties'
arguments on this point center on conclusory assertions that KTM advertisements and
communications are "political" in nature, as TURF urges, versus merely "informational" or
"educational," as the officials insist. To determine whether TURF has stated a claim for a violation
of subsection (c), however, we must first determine what the legislature meant by "political purpose"
in that provision.

 Statutory construction presents a question of law that we review de novo. See State
v. Shumake, 199 S.W.3d 279, 284 (Tex. 2006). Our primary objective in statutory construction is to
give effect to the legislature's intent. See id. We seek that intent "first and foremost" in the statutory
text. Lexington Ins. Co. v. Strayhorn, 209 S.W.3d 83, 85 (Tex. 2006). "Where text is clear, text
is determinative of that intent." Entergy Gulf States, Inc. v. Summers, 282 S.W.3d 433, 437
(Tex. 2009) (op. on reh'g) (citing Shumake, 199 S.W.3d at 284; Alex Sheshunoff Mgmt. Servs.
v. Johnson, 209 S.W.3d 644, 651-52 (Tex. 2006)). We consider the words in context, not in
isolation. State v. Gonzalez, 82 S.W.3d 322, 327 (Tex. 2002). We rely on the plain meaning of the
text, unless a different meaning is supplied by legislative definition or is apparent from context, or
unless such a construction leads to absurd results. See Entergy Gulf States, Inc., 282 S.W.3d at 437;
City of Rockwall v. Hughes, 246 S.W.3d 621, 625-26 (Tex. 2008); see also Tex. Gov't Code Ann.
§ 311.011 (West 2005) ("Words and phrases shall be read in context and construed according to the
rules of grammar and common usage," but "[w]ords and phrases that have acquired a technical or
particular meaning, whether by legislative definition or otherwise, shall be construed accordingly.").
We should also read every word, phrase, and expression in a statute as if it were deliberately chosen,
and likewise presume that words excluded from the statute are done so purposefully. See Shook
v. Walden, 304 S.W.3d 910, 917 (Tex. App.--Austin 2010, no pet.). Our analysis of the statutory
text is also informed by the presumptions that "the entire statute is intended to be effective" and that
"a just and reasonable result is intended," Tex. Gov't Code Ann. § 311.021(2), (3) (West 2005), and
consideration of such matters as "the object sought to be attained," "circumstances under which the
statute was enacted," legislative history, and "common law or former statutory provisions, including
laws on the same or similar subjects." Id. § 311.023(1)-(4) (West 2005). Similarly, we assume that
when enacting a statute, the legislature was aware of the background law and acted with reference
to it. See Acker v. Texas Water Comm'n, 790 S.W.2d 299, 301 (Tex. 1990). However, only when
the statutory text is ambiguous "do we 'resort to rules of construction or extrinsic aids.'" Entergy
Gulf States, Inc., 282 S.W.3d at 437 (quoting In re Estate of Nash, 220 S.W.3d 914, 917
(Tex. 2007)).

 Although the legislature used the term "political purpose" in both subsection (c) and
(d) of section 556.004, it did not define the term anywhere in chapter 556. All other things being
equal, the adjective "political," like its noun form, "politics," can have a range of meanings. In its
most general sense, "politics" refers to the science of the organization or administration of
government, (8) and "political" is that which relates to government or the conduct of government. (9) The
legislature used "political" in this sense elsewhere in chapter 556--section 556.0055 regulates the
use of state funds for "lobbying" by "political subdivisions." See Tex. Gov't Code Ann. § 556.0055
(West 2004). The terms also have narrower (and sometimes pejorative) connotations relating to the
grappling between individuals and groups for power, leadership, and influence over government,
especially through electoral or partisan competition. (10) Additionally, a third set of definitions,
somewhere in between the other two in their scope and generality, refers to the formulation and
influencing of governmental policy, as distinguished from the administration of such policy. (11) 

 We can quickly conclude that the legislature did not intend to incorporate the first
definition of "political" in subsection (c). Assuming that meaning of "political" in subsection (c),
the provision would prohibit state employees from using their official authority or influence or
permitting the use of a state agency program to achieve a purpose related to government or the
conduct of government. The legislature could not possibly have intended to mandate governmental
inaction, and we must reject such a construction. See T.C.R. v. Bell County Dist. Atty's Office,
305 S.W.3d 661, 671-72 (Tex. App.--Austin 2009, no pet.) (discussing "absurd results" limitation
on textual literalism, whereby we reject constructions that legislature could not possibly have
intended); see also Tex. Gov't Code Ann. § 311.021(2), (3) (we are to presume that "the entire
statute is intended to be effective" and that "a just and reasonable result is intended"). However, the
remaining potential definitions and constructions require further analysis. It is not inconceivable
that the legislature intended subsection (c) to prohibit state employees from using official authority
or influence or permitting use of state programs to impact the formulation of broader public policy,
as opposed to merely exercising delegated powers to implement and administer such policy.
Alternatively, subsection (c) could have been intended to more narrowly prohibit state employees
from using official authority and influence or permitting use of state programs to help particular
individuals or groups gain power, leadership, and influence over government and the policymaking
process through electoral or partisan competition.

 We can obtain additional guidance regarding the meaning of "political purpose" from
the structure of subsection (c). Within subsection (c), the legislature prohibited state officers and
employees from using their official authority or influence or permitting state programs (1) to affect
the result of an election; (2) to affect the nomination of a candidate; or (3) to achieve "any other
political purpose." This usage demonstrates that the legislature considered the first two purposes
(affecting election results or candidate nominations) to be "political purposes." Further, the fact that
the legislature preceded the catch-all phrase "any other political purpose" with two specific examples
of "political purposes" is also significant. Under the rule of ejusdem generis, when words of a
general nature are used in connection with the designation of particular objects or things, we
generally presume that the legislature intended to limit the general words to the same class or kinds
as the specific examples. See Hilco Elec. Coop. v. Midlothian Butane Gas Co., 111 S.W.3d 75, 81
(Tex. 2003) ("[T]he rule of ejusdem generis . . . provides that when words of a general nature are
used in connection with the designation of particular objects or classes of persons or things, the
meaning of the general words will be restricted to the particular designation."); Hightower v. State
Comm'r of Educ., 778 S.W.2d 595, 598 (Tex. Civ. App.--Austin 1989, no writ) (applying ejusdem
generis in construing "other full-time professional employee" to be limited to jobs entailing
same types of activities as specific job classifications that preceded it in statute); see also Hilton
v. Southwestern Bell Tel. Co., 936 F.2d 823, 828 (5th Cir. 1991) (per curiam) (ejusdem generis rule
"is one of limitation, restricting general terms, such as 'any other' and 'and the like,' which follow
specific terms, to matters similar to those specified"). Applying that guidepost here, it indicates that
the legislature in subsection (c) viewed "political purposes" to mean purposes similar in kind or
nature to achieving or aiding the nomination or election of candidates. (12)

 Also instructive are subsection (c)'s historical origins. The statute that became
government code chapter 556 was originally enacted in 1983. Act of May 28, 1983, 68th Leg., R.S.,
ch. 579, 1983 Tex. Gen. Laws 3763, 3763-65. As enacted, the statute's prohibitions included
only those found in current subsections (c) and (d), as well as the language found in current
subsection (e). See id. at § 3, 1983 Tex. Gen. Laws 3763, 3763-64. (13) These types of restrictions
have a long history in American law, dating back to as early as the Civil Service Act of 1883,
also known as the Pendleton Act, in which Congress created a merit-based civil service, eschewing
"the spoils system under which federal employees came and went, depending upon party service
and changing administrations rather than meritorious performance." See United States Civil Serv.
Comm'n v. National Ass'n of Letter Carriers, 413 U.S. 548, 557-59 (1973) (summarizing this
history). To prevent the former "mixing of partisan politics and routine federal service" from
undermining the merit system, id., Congress provided that "no person in the public service is for that
reason under any obligations to contribute to any political fund, or to render any political service,"
and that "no person in said service has any right to use his official authority or influence to coerce
the political action of any person of body." Id. at 558 (quoting Pendleton Act). Additional
limitations on federal employees' political activities were subsequently imposed by rule,
Civil Service Commission decisions, and statute, most prominently the Hatch Act, which was
also extended to certain employees of state governmental entities that receive federal funds. Letter
Carriers, 413 U.S. at 559-63; see 5 U.S.C. §§ 1501-08 (state and local employees), 7221-26 (federal
employees). As the United States Supreme Court has observed, these limitations advanced the goals
of ensuring that covered employees impartially execute the laws "without bias or favoritism for or
against any political party or group or the members thereof," preventing a "rapidly expanding
Government work force" from being "employed to build a powerful . . . political machine," ensuring
that "employment and advancement in the Government service not depend on political
performance," and shielding employees "from pressure and express or tacit invitation to vote in
a certain way or perform political chores in order to curry favor with superiors." Letter Carriers,
413 U.S. at 566-67. In light of these origins and purposes, the federal courts have long held that the
"political" activities targeted by the enactments are partisan political activities, those directed toward
the success of a political party. See United Pub. Workers v. Mitchell, 330 U.S. 75, 100 (1947).

 Some version of these restrictions on government employees' political activities
has since been replicated in every state, including Texas. Although there appear to be no reported
Texas judicial decisions on point, the Attorney General, analyzing statutes with language materially
similar to subsections (c) and (d) of section 556.004, has concluded that the Texas enactments
are modeled on the Hatch Act and prohibit only partisan or electoral political activities. See
Opinion No. MW-149 (1980) (restriction on DPS employees); Opinion No. M-1099 (1972)
(restrictions on department of public welfare employees). Courts applying other states' parallel
political-activity restrictions have reached similar conclusions. See Bauers v. Cornett, 865 F.2d
1517, 1524-27 (8th Cir. 1989) (Missouri prohibition on soliciting financial assistance from
state employees for "any political party, candidate, political fund, or publication, or for any other
political purpose" tied to elections having substantial political-party participation); Montana Sports
Shooting Ass'n, Inc. v. State of Montana, 185 P.3d 1003, 1005-09 (Mont. 2008) (prohibition
against agency employee using "official authority or influence for the purpose of . . . influencing
the political actions of any person or body" did not bar agency employees from lobbying legislature;
U.S. Supreme Court's precedents supported "decision to limit the phrase 'political actions' to
partisan politics"); Heidtman v. City of Shaker Heights, 126 N.E.2d 138, 142-43 (Ohio 1955) (city
employee's circulating of initiative petition did not violate local prohibition on "political activity";
term referred to "politics in its narrower partisan sense").

 We must presume that the legislature was familiar with these connotations of
"political" purpose when enacting a statute of this type. See State v. Young, 265 S.W.3d 697,
703 (Tex. App.--Austin 2008, pet. denied). These connotations, along with the structure of
subsection (c), lead us to conclude that the legislative focus of government code section 556.004,
subsection (c), is on preventing state officers and employees from using their official authority or
influence or permitting the use of state agency programs to achieve "political purposes" related to
candidate elections and partisan politics, as opposed to achieving more general influence on public
policy. TURF complains only of the latter.

 In its live petition, TURF alleges that "[f]ollowing a legislative session [2007] in
which it was roundly criticized for its advocacy of an expansive toll road policy, TxDOT launched
a political campaign called "Keep Texas Moving" ("KTM") in an attempt to advocate a public policy
of tolling most roads in Texas. As federal, state, and local officials debate and vote on the
advisability of this policy, and the public weighs in on the issue via environmental clearance
hearings, TxDOT has sought to influence this political issue with its KTM campaign." TURF further
pleads that "the KTM campaign is a one-sided attempt to advocate one political point of view on a
highly controversial matter that is far from politically decided" and that TxDOT is engaging in
"blatant advocacy for a toll road policy throughout the state."

 Similarly, TURF relies on evidence that, in its view, demonstrates that the KTM
campaign is "political advocacy" intended "to skew the political debate in Texas in favor of
expansive toll road policy." This includes materials from the marketing firm that devised the
KTM campaign, which reflect that a major focus of the campaign was to combat what had
been determined from polling to be "very low overall public awareness" regarding "the TTC and
toll roads" combined with "negative press" generated by "persistent local opposition and the series of
public meetings held around the state regarding the Trans-Texas Corridor." Goals of the campaign
included "creat[ing] an informed public about the benefits of the TTC and tolls," "mitigat[ing]
negative press," and "implement[ing] a sustainable and measurable means for TxDOT to proactively
inform and involve the public on the agency's strategic initiatives." The record also includes
advertisements, screen shots from the "Keep Texas Moving" website, and TxDOT training materials
used to prepare representatives for talk-radio appearances, which reflect the messaging that
road congestion in Texas is a problem, that Texas's population growth is outpacing traditional
transportation-funding mechanisms, that TxDOT has innovative solutions for the problem that
include, but are not limited to, toll roads and the TTC concept, and that toll roads and the TTC
concept have numerous benefits. Citing expert affidavits, TURF attacks various TxDOT assertions
regarding toll roads as "slanted," "unsupported," or "false." TURF also cites evidence to the effect
that issues relating to toll roads and the TTC have been controversial, that individual citizens
and grassroots groups like TURF had spoken out in opposition to these sorts of projects, and that
various plans and proposals related to such projects were currently being debated at public hearings
and other fora.

 While these allegations and evidence, if taken as true, might reflect agency efforts
to influence public opinion (and, ultimately, public policy) concerning TTC projects or tolling,
TURF has not alleged nor presented evidence of the sorts of "political purposes" that are the concern
of subsection (c). In fact, the evidence is to the contrary. In his deposition, Chase testified that
TxDOT had postponed the KTM media effort until June 2007 so it would not coincide with either
the 2006 governor's race or the 2007 legislative session. We also observe that during Saenz's
deposition, TURF's counsel, while questioning the witness regarding his understanding of
chapter 556.004(c)'s limits, acknowledged "I know you're not doing that" when posing a
hypothetical of TxDOT using "tax money to promote Governor Perry as part of its promotion
of toll roads." The closest TURF comes to raising a fact issue regarding "political purpose" is an
affidavit from a Bexar County commissioner who "believe[d] that TxDOT's Keep Texas Moving
campaign constitutes an indirect political attack on me and other public officials who question the
advisability of an extensive toll road policy" in that it "implies that those public officials . . . are not
in favor of 'keeping Texas moving.'" Without more, we cannot conclude that these statements
raise a fact issue as to the sort of nexus with partisan and electoral politics required to violate
subsection (c). We conclude that TURF has failed to state a claim to restrain actions ultra vires of
section 556.004 and lacks standing to assert its claims predicated on violations of that provision. (14)


 Statutory prohibitions against "lobbying" by state agencies 

 TURF also asserts that it stated a claim for violations of two provisions of
government code chapter 556 that restrict lobbying by state agencies. First, it relies upon the
following prohibition in section 556.005:


A state agency may not use appropriated money to employ, as a regular full-time or
part-time or contract employee, a person who is required by Chapter 305 to register
as a lobbyist. 



Tex. Gov't Code Ann. § 556.005(a) (West 2004). The "Chapter 305" referenced in the provision
refers to chapter 305 of the government code, which requires that a person who receives a specified
amount of compensation for "communicat[ing] directly with one or more members of the legislative
or executive branch to influence legislation or administrative action" must register and disclose his
clients and amount of compensation. See id. § 305.003-.005 (West 2005 & Supp. 2009). Second,
TURF relies upon government code section 556.006:


Sec. 556.006. LEGISLATIVE LOBBYING. (a) A state agency may not use
appropriated money to attempt to influence the passage or defeat of a legislative
measure.


(b) This section does not prohibit a state officer or employee from using state
resources to provide public information or to provide information responsive to a
request.



Id. § 556.006 (West 2004). 

 In its live petition, TURF alleges that "TxDOT has hired lobbyists and openly lobbied
local, state, and federal officials in support of TxDOT's desire to toll existing federal interstate
highways and other tolling initiatives that are not yet in development." TURF further pleads that
"Defendants have directed the expenditure of public funds to lobby the United States Congress in
favor of a policy of expanding toll roads and tolling existing interstate highways." TURF seeks to
restrain "any attempt to lobby any governmental unit or official in favor of any policy or legislative
measure to expand or change toll road policy and/or any attempt to hire lobbyists required to be
registered with the Texas Ethics Commission under [chapter] 305 of the [government code]."

 Like TURF's allegations regarding the "political" purpose of the KTM campaign,
whether the agency has "lobbied" or "hired" a "lobbyist" in any sense relevant to sections 556.005
or 556.006 depends on what those provisions mean and the specific conduct that is the basis
for TURF's claims. As further elucidated by the evidence on which it relies, TURF is complaining
primarily about conduct by the Rodman Company in its outreach efforts to audiences in the TTC-69
study area. Some of these efforts were aimed at gaining support for the project from local officials,
including at least one instance where there is evidence that a Rodman Company subcontractor
was involved in garnering a supportive formal resolution from a county commissioner's court. There
was also evidence that the Rodman Company provided "Federal Outreach" to "educate audiences
about issues of importance to [TxDOT] and the successful implementation of TxDOT's
federal legislative agenda." In TURF's view, these facts constitute violations of section 556.006's
prohibition against TxDOT's using appropriated money "to attempt to influence the passage
or defeat of a legislative measure." TURF also emphasizes evidence that the Rodman Company
subcontracted with Gary Bushell, L.L.P. for communications and outreach to local officials and that
Gary Bushell, L.L.P., is registered under chapter 305. This, TURF reasons, constitutes a violation
of section 556.005's prohibition against using appropriated money "to employ, as a regular full-time
or part-time or contract employee, a person who is required by Chapter 305 to register as a lobbyist."

 We do not reach these contentions because the evidence conclusively demonstrates
that the Rodman Company's work in connection with the TTC-69 had ended by March 2008. As
previously explained, TURF's associational standing derived from the taxpayer standing of
its members is limited solely to challenging future or ongoing illegal expenditures. See Bland Indep.
Sch. Dist., 34 S.W.3d at 556-58. However, TURF's justiciable interest in its claims--even if
meritorious--dissipated once the funds were spent. See id. at 556. Consequently, TURF lacks
standing to prosecute claims predicated on the Rodman Company's actions.

 TURF additionally relies on an affidavit from an attendee at the February 1, 2008
"Eminent Domain SuperConference," Hank Gilbert. Gilbert recounted that appellees' counsel of
record "gave a brief overview of all the eminent domain legislation that had been presented during
the 80th Regular legislative session," including H.B. 2006, which would have placed various
restrictions on the eminent domain powers of governmental units. (15) According to Gilbert, counsel
"listed various portions of the bill that TxDOT objected to," "by her own admittance, she attended
a 'closed door' meeting on behalf of TxDOT with other lobbyists," and "was asking, on their behalf
(TxDOT), to include $100 million for the access portion of HB 2006." However, as with TURF's
complaints about the Rodman Company's activities, TURF lacks standing to enjoin any expenditures
for any activities by counsel that would have violated section 556.006, which would have occurred
not later than May 2007.

 Finally, TURF relies on evidence that TxDOT has long engaged in federal legislative
advocacy and continues to do so. This includes deposition testimony from a TxDOT official who
acknowledged that the agency has a federal legislative agenda and hired "consultant lobbyists"
in Washington D.C. to help seek federal funds and other favorable measures from the Congress
or federal agencies. The officials respond in part that section 556.006's lobbying prohibition
does not extend to federal legislation. They observe that section 751.005 of the government code
creates an agency, the Officer of State-Federal Relations (OSFR), that is authorized to advocate
for federal legislation on behalf of the State. See Tex. Gov't Code Ann. § 751.005(b)(5)(C)
(West Supp. 2009). OSFR is further authorized to enter into interagency contracts with other
state agencies to locate staff of the other agencies in Washington D.C. to work under the
OSFR director's supervision, and OSFR has done so with TxDOT. Especially in light of these
legislative authorizations for federal legislative advocacy, we agree that the legislature did not intend
section 556.006's lobbying prohibition to extend to federal legislation.

 We conclude that TURF lacks standing to assert its claims regarding government code
sections 556.005 and 556.006 and, further, has not stated a claim of ultra vires conduct with respect
to TxDOT's federal legislative advocacy.

 Hatch Act

 Finally, in addition to relying on the foregoing prohibitions in chapter 556 of
the government code, TURF asserts that it has stated a claim that expenditures made in connection
with the KTM campaign violate provisions of the federal Hatch Act that extend to certain state and
local government employees. See 5 U.S.C.A. §§ 1501-08 (2007). Specifically, TURF relies upon
a prohibition against "a state or local officer or employee . . . directly or indirectly . . . command[ing]
or advis[ing] a state or local officer or employee to pay, lend, or contribute anything of value to a
political party, committee, organization, agency or person for political purposes." Id. § 1502(a)(2).
As previously explained, the "political" activities and purposes that are restricted by the Hatch Act
have long been construed as limited to partisan political activities. See Letter Carriers, 413 U.S.
at 562; Bauers, 865 F.2d at 1523-24. There are no allegations or evidence of that sort of "political"
purpose or activity here. Accordingly, TURF has not stated a claim of actions ultra vires of the
Hatch Act and lacks standing to assert its claims predicated on that provision.

 

 Conclusion regarding TURF's claims

 Although the officials advance other grounds for affirming the dismissal of TURF"s
claims, we need not address them. For the foregoing reasons, we hold that the district court did not
err in granting the officials' plea to the jurisdiction. We overrule TURF's first issue.


Procedural issues

 In its second issue, TURF argues that the district court abused its discretion in
refusing to grant it a second continuance of the hearing on appellees' plea to the jurisdiction. We
have previously summarized the procedural history of this case, including the facts that the
district court had already granted TURF one ninety-day continuance of the hearing to conduct
discovery--a postponement that ultimately exceeded five months--and that TURF had the
opportunity to obtain several depositions from TxDOT personnel and document discovery in the
interim. Furthermore, the district court granted TURF leave after the hearing to supplement the
record with over one-hundred pages of additional documentary evidence. On this record, we cannot
conclude that the district court abused its discretion in denying TURF's second continuance motion. TURF also complains that appellees' plea to the jurisdiction "deeply implicates the
merits of Appellant's causes of action" and that resolution of these issues turned on intent, motive,
and credibility--namely, whether expenditures made in connection with the KTM campaign were
motivated by a "political purpose." Consequently, TURF reasons, it was an abuse of discretion for
the district court to resolve those issues at the jurisdictional stage. See Hendee, 228 S.W.3d at 369
("[A] trial court must exercise sound discretion in determining whether a jurisdictional determination
impacting the merits 'should be made at a preliminary hearing or await a fuller development of the
case . . . .'" (quoting Miranda,133 S.W.3d at 227)). However, as we recently explained, "[w]hile
genuine disputes over the existence of facts material to jurisdiction will preclude dismissal,
see Miranda, 133 S.W.3d at 227-28, the pure legal question of whether pled and un-negated facts
would establish . . . ultra vires conduct can--and must--be resolved to determine the trial court's
jurisdiction, and this is true regardless of whether that issue parallels the merits." Creedmoor-Maha
Water Supply Corp., 307 S.W.3d at 516 (citing Hendee, 228 S.W.3d at 368-69); see also Miranda,
133 S.W.3d at 227 (emphasizing that jurisdictional issues should be resolved "as soon as
practicable"). Here, as we have detailed above, whether TURF stated claims for violations of
government code section 556.004(c) or the Hatch Act turns on a pure question of law--construction
of "political purpose" as used in those provisions--and was properly resolved by the district court
in determining its subject-matter jurisdiction. 

 We overrule TURF's second issue.


CONCLUSION

 Having overruled both of TURF's issues, we affirm the district court's judgment.



 ___________________________________________

 Bob Pemberton, Justice

Before Justices Patterson, Pemberton and Waldrop;

 Concurring Opinion by Justice Patterson


Affirmed


Filed: August 20, 2010

1. See generally Tex. Transp. Code Ann. §§ 227.001-083 (West Supp. 2009).
2. See id. §§ 227.021-.023. 
3. See generally id. §§ 228.001-254 (West Supp. 2009).
4. The visual materials featured a "Keep Texas Moving" logo. 
5. A somewhat different standard applies when a challenge to a jurisdictional fact's existence
does not implicate the merits. See University of Tex. v. Poindexter, 306 S.W.3d 798, 806
(Tex. App.--Austin 2009, no pet.).
6. In the alternative, TURF's claims against TxDOT and the Commission were properly
dismissed for the same reasons that we affirm dismissal of TURF's claims against Saenz and Chase
in their official capacity, discussed below.
7. There is no dispute that each official is either a "state officer" or "state employee," and the
distinction between the two statutory categories is not material to this case. See Tex. Gov't Code
Ann. § 556.001(3), (4) (West 2004). Likewise, there is no dispute that TxDOT is a "state agency"
under chapter 556. See id. § 556.001(2) (West 2004).
8. See Black's Law Dictionary 1277 (9th ed. 2009) ("[t]he science of the organization and
administration of the state"); Webster's Ninth New Collegiate Dictionary 911 (1984) ("the art or
science of government"); see also id. ("the total complex of relations between people in society"). 
9. See Black's Law Dictionary 1276 ("of or relating to the conduct of government");
Webster's Ninth New Collegiate Dictionary 910 (1984) ("of and relating to government, a
government, or the conduct of government," "organized in governmental terms"); see also
Margraves v. State, 56 S.W.3d 673, 687 & n.6 (Tex. App.--Houston [14th Dist.] 2001, no pet.)
(citing dictionary definition of "political" as "of or pertaining to public policy . . . relating to affairs
of state or administration" in distinguishing "political" use of state aircraft from "personal" use);
Heidtman v. City of Shaker Heights, 126 N.E.2d 138, 143 (Ohio 1955) (quoting dictionary definition
of "politics" as "the branch of civics that treats of the principles of civil government and the conduct
of state affairs; the administration of public affairs in the interest of peace, prosperity and safety
of the state; statecraft; political science; in a wide sense embracing the science of government and
civil polity").
10. See Black's Law Dictionary 1277 ("politics" includes "[t]he activity or profession of
engaging in political affairs"); Webster's Ninth New Collegiate Dictionary 910-11 (1984) ("politics"
includes "the art or science concerned with winning and holding control over a government . . .
competition between competing interest groups or individuals for power and leadership (as in a
government) . . . political life esp. as a principal activity or profession . . . political activities
characterized by artful and often dishonest practices . . . the political opinions or sympathies of
a person" and "political" includes "of, relating to, or involving politics and esp. party politics");
see also Heidtman, 126 N.E.2d at 143 ("politics" includes "political affairs in a party sense; the
administration of public affairs or the conduct of political matters so as to carry elections and secure
public office; party intrigues; political wirepulling; trickery").
11. Webster's Ninth New Collegiate Dictionary 911 ("politics" includes "the art or science
concerned with guiding or influencing governmental policy" and "political" includes "of, relating
to, or concerned with the making as distinguished from the administration of governmental policy"). 
12. The legislature's use of "political purpose" in subsection (d) is not inconsistent with this
construction. There, as previously noted, the legislature barred certain actions by state employees
to influence other persons' contributions or loans of things of value "to a person or political
organization for a political purpose." Tex. Gov't Code Ann. § 556.004(d) (West 2004). "Political
organization," like "political purpose," is not defined. However, subsection (d) implies that acts in
relation to a "political organization" are not in themselves "for a political purpose," as the
provision's focus is limited to influencing contributions or loans of things of value "to a person or
political organization for a political purpose."
13. The prohibition against state agencies using appropriated money for legislative lobbying
found in current section 556.006 (discussed below) did not appear until 1997, when it was added
as part of a broader series of enactments related to state fiscal matters. See Act of May 28, 1997,
75th Leg., R.S., ch. 1035, § 86, sec. 556.006, 1997 Tex. Gen. Laws 3845, 3866-67. The limitations
on use of state resources for supporting candidates for office contained in current subsections (a) and
(b) of section 556.004, as well as current section 556.005's restrictions against state agencies
employing lobbyists (discussed below) were added in a 1999 enactment intended to codify spending
restrictions that had formerly been imposed through appropriations act riders. Act of May 29, 1999,
76th Leg., R.S., ch. 1498, § 1, secs. 556.004-.005, 1999 Tex. Gen. Laws 5153, 5153-54; see
Senate Comm. on Finance, Bill Analysis, Tex. S.B. 177, 76th Leg., R.S., 1999.
14. As one of its responses to TURF's arguments concerning government code
section 556.004, the officials have asserted that the KTM campaign is specifically authorized by
section 228.004 of the transportation code, which provides:


The department may, notwithstanding Chapter 2113, Government Code, engage in
marketing, advertising, and other activities to promote the development and use of
toll projects and may enter into contracts or agreements necessary to procure
marketing, advertising, or other promotional services from outside service providers.


Tex. Transp. Code Ann. § 228.004 (West Supp. 2009). Even if the KTM campaign somehow
violated government code section 556.004(c), they reason, transportation code section 228.004's
specific authorization would control over the general prohibition. See Tex. Gov't Code Ann.
§ 311.026 (West 2005). Because we have concluded that TURF has not stated a claim for violations
of government code section 556.004, we do not address the implications of transportation code
section 228.004. For the same reasons, we do not reach arguments advanced by TURF that
section 228.004 is unconstitutional. TURF also argues that section 228.004 is preempted by the
Hatch Act. While we need not reach the preemption question, we address TURF's stand-alone
Hatch Act claim below. 
15. H.B. 2006 passed both houses of the legislature but was vetoed by the governor.